**TAX ANALYSTS, Appellee.**

v.

**INTERNAL REVENUE SERVICE, Appellant.**

Nos. 96–5152, 96–5241.

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1997.

Decided July 8, 1997.

Jonathan S. Cohen, Attorney, U.S. Department of Justice, argued the cause, for appellant. With him on the briefs were Loretta C. Argrett, Assistant Attorney General, Murray S. Horwitz, Attorney, and Eric H. Holder, Jr., U.S. Attorney, Washington, DC.

William A. Dobrovir, Warrenton, VA, argued the cause and filed the brief, for appellee.

Before: RANDOLPH and ROGERS, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

RANDOLPH, Circuit Judge:

Tax Analysts, a nonprofit District of Columbia corporation, brought an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the Internal Revenue Service to disclose certain documents known as "Field Service Advice Memoranda." The district court issued an order requiring disclosure after redaction. The IRS appeals on the grounds that the court misconstrued FOIA § 552(a)(2)(B), and that the records were protected by FOIA exemptions 3 and 5.

I

Field Service Advice Memoranda, known by their initials "FSAs," are issued by the Office of Chief Counsel for the IRS. The Office of Chief Counsel employs more than 1600 attorneys and provides legal advice to the IRS, directs litigation in the Tax Court, and provides guidance and support for litigation in other courts. *See* INTERNAL REVENUE MANUAL 1171 (1993). Although the Chief Counsel is the chief legal officer for the IRS, *id.,* the Office of Chief Counsel is not part of the IRS. The Chief Counsel is an Assistant General Counsel of the Treasury Department, appointed by the President with the advice and consent of the Senate. 31 U.S.C. § 301(f)(2). For most purposes, the Chief Counsel is subject to the supervision of the General Counsel of the Treasury Department, not the Commissioner of Internal Revenue (although during the time period relevant to this case, the Commissioner delegated certain IRS functions, including handling agency appeals, to the Office of Chief Counsel, and the Commissioner retained authority over the Office

of Chief Counsel with respect to those functions). INTERNAL REVENUE MANUAL 1112.62 (1990). According to the deposition testimony of senior officials in the Office of Chief Counsel, that office understands itself as independent from the IRS.

Attorneys in the national office of the Office of Chief Counsel prepare FSAs in response to requests from field personnel of either the Office of Chief Counsel or the IRS, such as field attorneys, revenue agents, and appeals officers. Field personnel request an FSA for legal guidance, usually with reference to the situation of a specific taxpayer. Each FSA includes a statement of issues, a conclusions section, a statement of facts, and a legal analysis section. CHIEF COUNSEL DIRECTIVES MANUAL (35)(19)44 (1992).[1] The staff preparing an FSA are instructed that the conclusions section should recommend a position on each issue and state "any limitations or conditions to which a conclusion may be subject." *Id.* The style of the analysis section "should be exploratory and descriptive so that the strengths and weaknesses of a case are presented and developed candidly, directing attention to the authorities against the conclusions arrived at as well as those which support them." *Id.*

The government agrees that among the primary purposes of FSAs is ensuring that field personnel apply the law correctly and uniformly. The IRS tells us that FSAs are not formally binding on IRS field personnel who request them. It is not clear whether they bind requesters within the Office of Chief Counsel. In any case, the government concedes that FSAs are held in high regard and are generally followed.

Treasury Department regulations treat the Office of Chief Counsel as part of the IRS for purposes of FOIA requests. 31 C.F.R. § 1.1. Accordingly, Tax Analysts directed its requests for FSAs to the IRS, not the Office of Chief Counsel. Although Tax Analysts originally asked for both formal written FSAs and written records of advice provided informally to field personnel by telephone, Tax Analysts has since limited its claims to the approximately 1300 formal written FSAs issued by the Office of Chief Counsel between January 1, 1992, and December 14, 1993. The IRS failed to respond to Tax Analysts's initial requests within the statutory time period. Tax Analysts pursued unsuccessful administrative appeals and then filed suit in district court. The parties conducted extensive discovery, and both moved for summary judgment. The district court granted Tax Analysts's motion and later awarded it attorney's fees.[2]

## II

A remedial question needs to be addressed before we proceed any further. Throughout this litigation, Tax Analysts claimed that FSAs fall under the FOIA section requiring "[e]ach agency . . . [to] make available for public inspection and copying . . . those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a)(2)(B).[3] This is the so-called "reading room" provision.

The district court's memorandum opinion agreed that FSAs fell within § 552(a)(2)(B).

1. No FSAs are in the record, and the district court did not inspect any *in camera.* Sworn statements of the Assistant Chief Counsel (Field Service), an Associate Chief Counsel, and an attorney in the Office of the Assistant Chief Counsel (Disclosure Litigation) stated that FSAs are not widely distributed, and are not abstracted, or arranged in a manner to make them easily accessible. After briefing in this case had begun, the Justice Department attorneys representing the IRS learned that those statements were incorrect. In a commendable display of candor, they informed the court and Tax Analysts that until October 1993, the Office of Chief Counsel summarized some FSAs (including 166 of the FSAs at issue in this litigation) and distributed the summaries in the *Tax Litigation Bulletin.* This is

a monthly publication circulated to attorneys handling tax litigation in the IRS's national office and in district and regional counsel offices. In the Appendix to this opinion, we include a sample FSA summary that appeared in the *Tax Litigation Bulletin.*

2. Although the government appeals the award of attorney's fees, it concedes that the award must stand if we otherwise affirm the district court.

3. Tax Analysts also claims that the memoranda are "instructions to staff that affect a member of the public," 5 U.S.C. § 552(a)(2)(C). The district court did not reach this argument.

But rather than explicitly requiring the IRS to make these documents available in a reading room, the court's order directed the IRS to "release all requested" FSAs, except to the extent that certain statutory exemptions apply. The IRS takes this to mean that it is obligated only to produce the FSAs to Tax Analysts. Any broader relief, the IRS claims, would be beyond the court's authority in light of our opinion in *Kennecott Utah Copper Corp. v. Department of the Interior*, 88 F.3d 1191, 1202–03 (D.C.Cir.1996). FOIA's remedial provision, 5 U.S.C. § 552(a)(4)(B), provides that "[o]n complaint, the district court ... has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Kennecott* holds that § 552(a)(4)(B) does not empower district courts to order agencies to publish certain statements in the Federal Register, although FOIA requires agencies to do so, *see* 5 U.S.C. § 552(a)(1). The only remedy § 552(a)(4)(B) mentions is an order directing the agency to produce the records to the complaining party. *See Kennecott*, 88 F.3d at 1203.[4]

■ Tax Analysts has offered nothing in opposition to the IRS's argument regarding the limited scope of the remedy and it has not cross-appealed from the district court's order. We will, therefore, treat the argument as conceded for the purposes of this case only. This considerably simplifies matters. With the case in this posture there is no need for us to decide whether FSAs are "statements of policy and interpretations which have been adopted by the agency" under § 552(a)(2)(B). If § 552(a)(2)(B) did not require FSAs to be "made available for public inspection," another FOIA provision— § 552(a)(3)—required them to be made available to Tax Analysts, unless the documents were exempt from disclosure. Section 552(a)(3), which Tax Analysts invoked in its initial FOIA requests to the IRS, provides that: "Except with respect to records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules ... shall make the records promptly available to any person." There is, we believe, no doubt that the requests here "reasonably describe[d]" the FSAs. "A request reasonably describes records if 'the agency is able to determine precisely what records are being requested.'" *Kowalczyk v. Department of Justice*, 73 F.3d 386, 388 (D.C.Cir.1996) (quoting *Yeager v. Drug Enforcement Admin.*, 678 F.2d 315, 326 (D.C.Cir.1982)). The IRS has had no trouble identifying the FSAs Tax Analysts wanted. It told Tax Analysts precisely how many such documents existed, and it inspected the FSAs individually for privileged material and attorney work product.

### III

FSAs constitute agency "records" within 5 U.S.C. § 552(a)(3): the Office of Chief Counsel created the documents and retained control over them. *See Department of Justice v. Tax Analysts*, 492 U.S. 136, 144–45, 109 S.Ct. 2841, 2847–48, 106 L.Ed.2d 112 (1989). And as we have just concluded, Tax Analysts "reasonably" described these records in its requests. With these conditions satisfied, the government could properly refuse to produce the FSAs only if one of FOIA's exemptions justified withholding them. In this suit to compel production, "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B); *see also Petroleum Info. Corp. v. Department of the Interior*, 976 F.2d 1429, 1433 (D.C.Cir.1992).

The government invokes FOIA exemptions 3 and 5. FSAs fall under exemption 3, it says, because these are "matters" "specifically exempted from disclosure by statute," 5 U.S.C. § 552(b)(3). FSAs also are allegedly protected by exemption 5, which empowers an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than

---

**4.** *Kennecott* left open the question whether other sources of law might authorize additional remedial orders in FOIA cases. *See* 88 F.3d at 1203. *Cf. Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 17–20, 94 S.Ct. 1028, 1036–38, 39 L.Ed.2d 123 (1974); Kenneth Culp Davis, *The Information Act: A Preliminary Analysis*, 34 U. Chi L.Rev. 761, 775–77 (1967).

an agency in litigation with the agency," 5 U.S.C. § 552(b)(5).

## A. Exemption 3

 The government rests its exemption 3 claim on 26 U.S.C. § 6103. Amended in 1976 in the wake of Watergate and White House efforts to harass those on its "enemies list," § 6103 now restricts government officers and employees from revealing "any return" or "return information." "Return information" is defined as:

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, or other imposition, or offense....

26 U.S.C. § 6103(b)(2)(A). This definitional provision continues by excluding from the category of return information "data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer."[5] Passed as a floor amendment to § 6103(b)(2), the clause just quoted—the Haskell Amendment—became the subject of the Supreme Court's opinion in *Church of Scientology of California v. IRS,* 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987). The Court rejected two related arguments about the meaning of the Haskell Amendment—that it excluded from the definition of "return information" all data not identifying a particular taxpayer, and that the IRS had a duty under FOIA to delete portions of documents in order to bring them

within this view of the Haskell Amendment. *See id.* at 14, 108 S.Ct. at 273. To accept these arguments, the Court thought, would be to read out of the Amendment the qualifier "in a form." *Id.* at 15, 108 S.Ct. at 274 The Court also believed that if the Amendment were construed to allow the release of all nonidentifying data, this would "undercut the legislation's primary purpose of limiting access to tax filings." *Id.* at 16, 108 S.Ct. at 275.

That § 6103 is the sort of nondisclosure statute contemplated by FOIA exemption 3 is beyond dispute. To paraphrase exemption 3, § 6103 is a statute specifically exempting certain matters from disclosure to the general public and leaving the IRS with no discretion to reveal those matters publicly. Our decision in *Church of Scientology of California v. IRS,* 792 F.2d 146, 150 (D.C.Cir.1986), so holds. There is also no doubt that FSAs relating to individual taxpayers contain at least some "return information." Whether exemption 3 shields not simply part of each FSA but the entire document is the point of dispute. Under FOIA, if part of a document may be withheld, the rest of the document still may have to be produced after redaction. In statutory terms, "any reasonably segregable portion of a record" must be produced after deletion of the exempt portion. 5 U.S.C. § 552(b). IRS regulations also require the agency to disclose "any reasonably segregable portion of a record" after deleting exempt matters, including § 6103 return information. 26 C.F.R. § 601.701(b)(1)(iii), (b)(3). With respect to the FSAs pertaining to individual taxpayers, of which there are about 1192,[6] the IRS maintains that there is nothing to redact. The argument is that these records are entirely "return information" and thus completely protected from disclosure. The district court disagreed. In the court's view, those portions of the FSAs containing "discussion of tax law principles,

---

**5.** Another subsection, § 6103(e)(7), permits disclosure of return information to the taxpayer if this "would not seriously impair Federal tax administration," and § 6103(j)(4) prohibits persons who receive return information pursuant to § 6103(j) from revealing it "except in a form which cannot be associated with, or otherwise

identify, directly or indirectly, a particular taxpayer." *See also* 26 U.S.C. § 6108(c).

**6.** The others relate to classes of taxpayers rather than individuals. The IRS concedes that any return information in them may be redacted.

legal analysis or legal conclusions" were not protected by § 6103.

The district court's reasoning in support of this conclusion does not survive close attention. The court treated *Taxation With Representation Fund · v. IRS*, 646 F.2d 666 (D.C.Cir.1981) ("*TWRF*"), or at least a district court order in the case, as precedent for its interpretation of § 6103(b)(2). Our opinion in *TWRF* held that certain kinds of IRS documents were not protected from disclosure under exemption 5 of FOIA. The documents were of three types, two of which are relevant here. General Counsel Memoranda, or GCMs, consisted of legal advice rendered by the Office of Chief Counsel in response to requests from the Assistant Commissioner (Technical) in connection with proposed Private Letter Rulings, proposed Technical Advice Memoranda, and proposed Revenue Rulings. *TWRF*, 646 F.2d at 669. Technical Memoranda, or TMs, the second type of documents, were drafted by · attorneys in the Chief Counsel's office in connection with proposed Treasury decisions or regulations. *Id.* at 671. With respect to § 6103, the district court in *TWRF* authorized the IRS to redact all return information from the GCMs and TMs before turning them over to the plaintiff. *See id.* at 676. On appeal, the IRS apparently did not contest this order and our opinion did nothing more than mention it. *Id.*

To the district court here, *TWRF* supported these conclusions: (1) "in legally relevant aspects, FSAs are akin to GCMs and TMs"; and (2) since GCMs and TMs are not § 6103(b)(2) "return information" in their entirety, then neither are FSAs. The second proposition, critical in the court's analysis, does not follow from *TWRF*. Our *TWRF* opinion decided nothing about § 6103. True enough, the *TWRF* district court ordered the IRS to delete "return information" from the GCMs and TMs. But it never explained why, and it never specified what comprised return information. Nothing can be made of the IRS's determination not to appeal the redaction order. The government does not appeal every judicial order with which it disagrees. And it has no duty to do so. Its failure to appeal the *TWRF* order therefore cannot be seen as some sort of admission about § 6103's meaning. An appeal would have been futile anyway, which may explain why one was not taken. While *TWRF* was making its way through this circuit, a now-repudiated interpretation of the Haskell Amendment prevailed. Return information, we then believed, meant "only information that directly or indirectly identifies a particular taxpayer"; redaction of such information, we thought, removed § 6103's protection against disclosure. *See Neufeld v. IRS*, 646 F.2d 661, 665 (D.C.Cir.1981). We eventually overruled *Neufeld* in *Church of Scientology of California v. IRS*, 792 F.2d 153 (D.C.Cir. 1986) (en banc), *aff'd*, 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987). But when *TWRF* was before us, otherwise exempt documents could have been transformed into records beyond § 6103's protection by deleting identifying information, which is what the redaction order required.

We are therefore back to square one: Are the legal interpretations and analyses contained in the FSAs "any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, or other imposition, or offense," 26 U.S.C. § 6103(b)(2)(A)? If these portions of the FSAs are within the catchall "other data," the Supreme Court's *Scientology* opinion makes it irrelevant whether the legal analyses and conclusions themselves identify any individual taxpayers. *Church of Scientology*, 484 U.S. at 18, 108 S.Ct. 271. The IRS might reformulate the FSAs to remove all identifying information, as it did in the *Tax Litigation Bulletin* until 1993, and thereby bring them within the Haskell Amendment. *See Church of Scientology*, 792 F.2d at 163; and note 1 *supra*. But neither § 6103 nor FOIA imposes a duty on the IRS to undertake any reformulation.

As to § 6103(b)(2)(A)'s catchall clause, we know that FSAs, and the legal analyses in them, are "prepared by ... the Secretary with respect to a return or with respect to the determination of the existence, or possi-

ble existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, or other imposition, or offense." But are legal interpretations of statutes, rules, regulations, and judicial opinions, and the legal conclusions flowing from those interpretations "data"? Tax Analysts says no, "data" means only facts and it is only facts that § 6103 protects, facts such as the taxpayer's identity, or income, or deductions, or the existence of an IRS audit or a criminal investigation. Cases from other circuits dealing with § 6103(b)(2) do not help either side.[7] Nor does the dictionary. Nor does legislative history. But principles of administrative law tilt in favor of the IRS's position.

■ The principles are the familiar ones, set down in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), calling upon the courts to defer to an agency's permissible construction of an ambiguous statute the agency administers. The IRS and the Office of Chief Counsel are the gatekeepers of federal tax information. Through § 6103, Congress charged these two agencies and their employees with the duty of protecting return information from disclosure to others within the federal government, and to the public at large. If the IRS adopts an interpretation of § 6103, therefore, *Chevron* is triggered. That the interpretative issue arises in the context of FOIA does not render *Chevron* inapplicable. It is true that we will not defer to an agency's view of FOIA's meaning. *See, e.g., FLRA v. Department of the Treasury, Fin. Management Serv.*, 884 F.2d 1446, 1451 (D.C.Cir.1989); *Association of Retired R.R. Workers, Inc. v. U.S. R.R. Retirement Bd.*, 830 F.2d 331, 334 (D.C.Cir.1987). No one federal agency administers FOIA. The meaning of FOIA should be the same no matter which agency is asked to produce its records. One agency's interpretation of FOIA is therefore no

more deserving of judicial respect than the interpretation of any other agency. But the meaning of FOIA is not at stake here. This aspect of the case turns on how § 6103(b)(2) is to be construed. And on that score, the IRS stands on the same footing as other agencies administering statutes confined to their particular spheres.

Of course, *Chevron* deference assumes that the agency has adopted an interpretation of the statute and that the court knows what that interpretation is. In this case, we have the letters of the Assistant Chief Counsel denying Tax Analysts's FOIA administrative appeals partly on the ground that the FSAs constituted § 6103(b) "return information" "in their entirety." The letters are conclusory. They do not say how the Chief Counsel construes the term "data" in § 6103(b)(2), or why. The IRS's brief in this court is a bit more enlightening. It argues that "data" includes legal conclusions and analyses as well as facts, indeed includes everything "generated by the IRS with respect to the liability of a taxpayer." One might consider the interpretation of § 6103 reflected in the IRS's argument to be merely a litigating position. But that would not necessarily preclude our deferring to the agency's interpretation so long as it represented the IRS's "fair and considered judgment on the matter," *Auer v. Robbins*, —— U.S. ——, ——, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997).

We therefore move on to the first inquiry in the *Chevron* analysis—namely, "whether Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. In the context of § 6103(b)(2)(A), does the term "data" refer only to facts, as Tax Analysts maintains, or is the meaning of the term unclear? Each of the specific items listed in the beginning of § 6103(b)(2)(A)—the taxpayer's identity, income, payments, exemptions, liabilities, net

---

7. *Cases sustaining IRS claims of exemption under* § 6103(b)(2) *include Currie v. IRS,* 704 F.2d 523, 531 (11th Cir.1983) (return information encompasses memoranda "reflecting the direction and scope" of an IRS investigation); *King v. IRS,* 688 F.2d 488, 494 (7th Cir.1982) ("IRS comment on the private tax situations of specific taxpayers"); *Breuhaus v. IRS,* 609 F.2d 80, 83 (2d Cir.1979) (an IRS letter to a member of Congress explaining a determination of tax liability); and *Chamberlain v. Kurtz,* 589 F.2d 827, 840–41 (5th Cir.1979) ("intra-agency communications regarding [a taxpayer's] tax liability, memoranda of conferences on that subject, [and] various 'sensitive case' reports").

worth and so forth—are factual in nature. *Ejusdem generis,* the canon of statutory construction limiting "general terms which follow specific ones to matters similar to those specified," *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936); *see also Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1471 (D.C.Cir.1997), thus militates in favor of the interpretation Tax Analysts proposes. But the line between facts and law is not always obvious; matters may be of the mixed-fact-and-law variety. *See Thompson v. Keohane,*. —— U.S. ——, —— – ——, 116 S.Ct. 457, 463–67, 133 L.Ed.2d 383 (1995). Should the statement "Taxpayer violated such and such section of the Code in reporting the $10,000 as a bad debt loss" be treated as one of fact or one of law? It is hard to believe Congress intended the IRS to pay attention to such quiddities in administering § 6103.

Still, there is something to the *ejusdem generis* point. Each of the specific items mentioned in the beginning of § 6103(b)(2)(A) is not only factual but unique to the particular taxpayer. And each of the more general items in § 6103(b)(2)(A)—"any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return" or the liability "of any person"—is of the same character, that is, unique to a particular taxpayer. The IRS has itself drawn this very distinction in propounding its view of what constitutes return information. FSAs relating to "groups or classes of taxpayers" rather than to a particular taxpayer, the IRS concedes, "do not constitute return information protected by Exemption 3." Yet legal analyses and conclusions also cannot be viewed as unique to a particular taxpayer, or as the IRS puts it, "taxpayer-specific." If the Office of Chief Counsel renders an interpretation of a certain section in the tax code, whether in an FSA or elsewhere, that interpretation should apply to all other taxpayers who are, in material respects, similarly situated. Treating like cases alike is, we have said, "the most basic principle of jurisprudence." *La-Shawn A. v. Barry,* 87 F.3d 1389, 1393 (D.C.Cir.1996) (en banc). We were there speaking of the judiciary, but the principle fully applies to those who administer the

federal tax laws. The IRS itself recognizes that to fulfill its mission it must ensure "uniform interpretation and application of the tax laws." INTERNAL REVENUE MANUAL 1111.1 (1988). When Congress amended the tax code in 1976 to require the IRS to disclose Private Letter Rulings and Technical Advice Memoranda, of which more hereafter, it did so because "the secrecy surrounding" these written determinations "has generated suspicion that the tax laws are not being applied on an evenhanded basis." S. REP. No. 94–938, ⸳pt. 1, at 305, *reprinted in* 1976 U.S.C.C.A.N. 3439, 3735; *see also* H.R. REP. No. 94–658, at 314, *reprinted in* 1976 U.S.C.C.A.N. 2897, 3210. Regulations, statutes, judicial rulings, and their interpretation and application, thus are decidedly not taxpayer-specific in any meaningful respect.

On other hand, we cannot say that the term "data" is incapable of bearing the meaning the IRS ascribes to it. For evidence that "data" might encompass not only facts but law, one need look no further than Supreme Court opinions. In *Standard Oil Co. v. Johnson,* 316 U.S. 481, 483, 62 S.Ct. 1168, 1169, 86 L.Ed. 1611 (1942), Justice Black, a legal craftsman of the first rank, referred to "regulations and practices under them" and "the relevant statutory and constitutional provisions" as "data." Justice Stewart wrote of "comprehensive data respecting the laws of the various States," *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 510, 82 S.Ct. 519, 523, 7 L.Ed.2d 483 (1962). Justice Harlan, in his dissenting opinion in *Miranda v. Arizona,* 384 U.S. 436, 522, 86 S.Ct. 1602, 1652, 16 L.Ed.2d 694 (1966), described the laws of foreign countries as "data." Justice Stone's opinion for the Court in *West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940), directed federal courts in diversity cases to use "all the available data" to ascertain state law, including intermediate state appellate opinions, a statement repeated many times, *see, e.g., Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Hicks v. Feiock,* 485 U.S. 624, 630 n. 3, 108 S.Ct. 1423, 1428, 99 L.Ed.2d 721 (1988). The legal rights of private parties are "data," according to *Wallis*

*v. Pan American Petroleum Corp.*, 384 U.S. 63, 70 n. 7, 86 S.Ct. 1301, 1305, 16 L.Ed.2d 369 (1966). And the Court has described Congress's review of "data compiled on the laws of the States as to the status of labor organizations as legal entities," *United Ass'n of Journeymen & Apprentices of the Plumb-. ing & Pipefitting Industry v. Local 334, United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Industry*, 452 U.S. 615, 624 n. 9, 101 S.Ct. 2546, 2552 n. 9, 69 L.Ed.2d 280 (1981).

While "data" therefore might signify even legal discussions, we are hard pressed to find any reason derived from § 6103 in favor of the IRS's interpretation. The IRS has offered none. It simply slaps § 6103 on the table and tells us that everything in an FSA, every line, every word, is immune from disclosure. If the FSA recites material from census reports or statistics relating to an industry or quotes statutes or regulations, all of this would be "return information." Why § 6103 should protect such non-taxpayer-specific information is a mystery the IRS has not offered to solve. This is not to suggest that the IRS has no reason for wanting to keep the FSAs secret. It has argued, in the context of another FOIA exemption, that revealing the law sections of these records would be disruptive to its enforcement efforts and might discourage those in the field from seeking national office advice. Whatever the merits of these IRS concerns, they have nothing to do with § 6103's core purpose of protecting taxpayer privacy. *See Church of Scientology*, 484 U.S. at 16, 108 S.Ct. at 275.

Furthermore, in interpreting § 6103 and in evaluating whether the IRS interpretation of "data" would be a permissible one if the term were ambiguous in the context of § 6103(b)(2)(A), we must look not only at that section but at related provisions in the statute. *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992); *Chemical Mfrs. Ass'n v. EPA*, 919 F.2d 158, 162–63 (D.C.Cir.1990); *Kennecott Utah Copper Corp. v. Department of the Interior*, 88 F.3d 1191, 1213 (D.C.Cir.1996). At the same time as Congress enacted the current version of § 6103, it enacted 26 U.S.C. § 6110. *See*

Tax Reform Act of 1976, Pub.L. No. 95–455, §§ 1201, 1202, 90 Stat. 1520, 1660, 1667. That section requires the IRS to disclose "any written determination" after deleting identifying details and certain other information. 26 U.S.C. § 6110(a), (c). A "written determination" is "a ruling, determination letter, or technical advice memorandum." *Id.* § 6110(b)(1).

The regulations define "Technical Advice Memorandum" as:

> a written statement issued by the National Office to, and adopted by, a district director in connection with the examination of a taxpayer's return or consideration of a taxpayer's claim for refund or credit. A technical advice memorandum generally recites the relevant facts, sets forth the applicable law, and states a legal conclusion.

26 C.F.R. § 301.6110–2(f). An IRS Revenue Procedure explains in more detail what the agency considers to be a Technical Advice Memorandum:

> "Technical advice" means advice or guidance in the form of a memorandum furnished by the national office [of the Office of Chief Counsel] upon the request of a district director or a chief, appeals office, submitted in accordance with the provisions of this revenue procedure, in response to any technical or procedural question that develops during any proceeding on the interpretation and proper application of tax law, tax treaties, regulations, revenue rulings, notices, or other precedents published by the national office to a specific set of facts. Such proceedings include: (1) the examination of a taxpayer's return; (2) the consideration of a taxpayer's claim for refund or credit; (3) any matter under examination or in appeals pertaining to tax-exempt bonds or mortgage credit certificates; and (4) any other matter involving a specific taxpayer under the jurisdiction of the chief, examination division, or the chief, appeals office....
>
> Technical advice helps Internal Revenue Service personnel close cases and also helps establish and maintain consistent holdings throughout the Service.

Rev. Proc. 97–2, 1997–1 I.R.B. 64, 67; *see also* CHIEF COUNSEL DIRECTIVES MANUAL (39)713 (1992). A Technical Advice Memorandum includes a statement of issues, a statement of facts, a statement of law, a discussion of the rationale supporting the conclusions reached, and a statement of conclusions. Rev. Proc. 97–2, 1997–1 I.R.B. at 79; CHIEF COUNSEL DIRECTIVES MANUAL Ex. (39)700–3 (1993).

We see no difference, relevant to § 6103, between FSAs and Technical Advice Memoranda. Both are means by which the national office of the Office of Chief Counsel provides field offices with advice about the tax laws in response to questions regarding specific factual situations. FSAs and Technical Advice Memoranda serve similar purposes and the outline they follow is basically the same. This is not to suggest that FSAs and Technical Advice Memoranda are identical. The Office of Chief Counsel's internal guidance points out the following distinctions: taxpayers are always permitted to participate in the technical advice process, while taxpayer participation in the FSA process is left to the discretion of field personnel; Technical Advice Memoranda, but not FSAs, are "final determinations" of the IRS's position; FSAs, unlike Technical Advice Memoranda, are not publicly released under FOIA or § 6110, are not widely distributed within the IRS or the Office of Chief Counsel, and are not disclosed to taxpayers. CHIEF COUNSEL DIRECTIVES MANUAL (35)274 (1996). Field personnel are instructed that "[t]he choice of whether to request Field Service Advice or Technical Advice depends on whether the advice is intended to establish the position of the Service in a specific case with respect to the issue presented." *Id.* None of these distinctions, however, has anything to do with the taxpayer privacy concerns underlying § 6103. With respect to the purposes of § 6103, Technical Advice Memoranda and FSAs amount to the same thing.

Congress did not mention FSAs in § 6110, but that is entirely understandable. FSAs did not exist in their present form until 1991, fifteen years after § 6110 became law. The provision nevertheless is significant. Only a Janus-faced Congress would, in § 6110, order the IRS to disclose the legal analysis portion of a Technical Advice Memorandum and then, in § 6103, order the IRS not to disclose the same portion of an FSA. The IRS's position, rather than bringing § 6103(b)(2)(A) into harmony with the rest of the Internal Revenue Code, would create an anomaly within the Code's disclosure system.

While the IRS's interpretation of "data" in § 6103(b)(2)(A) may be linguistically possible, we therefore conclude that it is not a permissible construction of the statute in light of its structure and purposes. Legal analyses contained in FSAs are not "return information" under § 6103, and the IRS's exemption 3 claim fails.

## B. Exemption 5

Exemption 5 permits an agency to withhold materials normally privileged from discovery in civil litigation against the agency. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 148–49, 95 S.Ct. 1504, 1515–16, 44 L.Ed.2d 29 (1975); *EPA v. Mink,* 410 U.S. 73, 85–86, 93 S.Ct. 827, 835–36, 35 L.Ed.2d 119 (1973). To justify invoking exemption 5 with respect to the FSAs, the IRS cites three recognized evidentiary privileges: the "deliberative process" privilege, the attorney-client privilege, and the attorney work product doctrine. *See, e.g., Burka v. Department of Health & Human Servs.,* 87 F.3d 508, 516 (D.C.Cir. 1996); *Pies v. IRS,* 668 F.2d 1350, 1352 (D.C.Cir.1981).

### 1. Deliberative Process Privilege

■■■ The deliberative process privilege, a variant of executive privilege, shields only government "materials which are both predecisional and deliberative." *Wolfe v. Department of Health & Human Servs.,* 839 F.2d 768, 774 (D.C.Cir.1988) (en banc) (citing *Mink,* 410 U.S. at 88, 93 S.Ct. at 836). The government has the burden of showing that the materials were "generated *before* the adoption of an agency policy" and "reflect[ ] the give-and-take of the consultative process." *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 866 (D.C.Cir. 1980). Here, the district court found that FSAs were neither predecisional nor deliberative.

"A strong theme of our [deliberative process] opinions has been that an agency will not be permitted to develop a body of 'secret law'...." *Coastal States,* 617 F.2d at 867; *see also* Davis, *supra,* 34 U. CHI. L.REV. at 797. FSAs, we believe, represent such a body of law. They contain the answers of the national office of the Office of Chief Counsel to legal questions submitted by IRS and Chief Counsel personnel in the field. As the IRS concedes, one of the main functions of FSAs is "the promotion of uniformity" throughout the country on significant questions of tax law. The legal conclusions the Office of Chief Counsel provides to field personnel constitute agency law, even if those conclusions are not formally binding. The legal memoranda ordered disclosed in *Coastal States* were not formally binding either, 617 F.2d at 859–60, a point we recognized in *TWRF,* 646 F.2d at 679.[8] And as in *Coastal States,* 617 F.2d at 869, the documents here are "routinely used" and relied upon by field personnel. The field offices may make the initial decisions with respect to individual taxpayers, and those decisions may not necessarily agree with the conclusions contained in FSAs. But the structure and purposes of the FSA system reveal that the national office, in issuing these memoranda, is attempting to develop a body of coherent, consistent interpretations of the federal tax laws nationwide. The fact that FSAs are nominally nonbinding is no reason for treating them as something other than considered statements of the agency's legal position. *Cf.* Note, *The Freedom of Information Act and the Exemption for Intra–Agency Memoranda,* 86 HARV. L.REV. 1047, 1058–60 (1973).[9]

Rather than documents produced in the process of formulating policy, FSAs are themselves statements of an agency's legal position and, as such, cannot be viewed as predecisional. *See Coastal States,* 617 F.2d at 868. Although FSAs may precede the field office's decision in a particular taxpayer's case, they do not precede the decision regarding the agency's legal position. Representing the considered view of the Chief Counsel's national office on significant tax law issues, FSAs do not reflect the "give-and-take" that characterizes deliberative materials. The IRS tells us that FSAs may evaluate the strengths and weaknesses of alternative views. But that does not make them deliberative. The government's opinion about what is not the law and why it is not the law is as much a statement of government policy as its opinion about what the law is.

Exemption 5, and the deliberative process privilege, reflect the legislative judgment that "the quality of administrative decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible." *Mead Data Cent., Inc. v. Department of the Air Force,* 566 F.2d 242, 256 (D.C.Cir.1977); *see also Sears,* 421 U.S. at 151, 95 S.Ct. at 1516; *Coastal States,* 617 F.2d at 866. A ruling that the privilege applies "should therefore rest fundamentally on the conclusion that, unless protected from public disclosure, information of that type would not flow freely within the agency." *Mead Data Cent.,* 566 F.2d at 256. This, the IRS maintains, would be the consequence of

---

**8.** *Vietnam Veterans of Am. v. Department of the Navy,* 876 F.2d 164, 165 (D.C.Cir.1989), stated that the "agency counsel opinions at issue [in *Coastal States*] operated as law because an auditor requesting an opinion was not empowered to disregard it." We do not believe the "empowered" part of this statement accurately depicts the situation in *Coastal States.* We there accepted the proposition that the auditors were free to reject the legal opinions, but added that as a practical matter the auditors "regularly and consistently" followed them. 617 F.2d at 859–60 & n. 8; *see also TWRF,* 646 F.2d at 679.

**9.** There is an exception to the Administrative Procedure Act's notice and comment rulemaking

provisions for "interpretive rules [and] general statements of policy." 5 U.S.C. § 553(b). In applying this provision, we have distinguished binding rules from policy statements and interpretive rules, which are not binding and which leave agency decisionmakers with some discretion. *See, e.g., Vietnam Veterans of Am. v. Secretary of the Navy,* 843 F.2d 528, 536–38 (D.C.Cir. 1988); *National Latino Media Coalition v. FCC,* 816 F.2d 785, 787–89 & n. 2 (D.C.Cir.1987). Yet no one could reasonably suppose that because statements of agency policy fall within the notice and comment exception, all agency policy statements are exempt from disclosure under FOIA.

making FSAs available to the public. If FSAs are revealed, the argument continues, officials who request and prepare these documents might be subjected to pressure from those who disagree with their reasoning, and to criticism when the advice turns out to be ill-considered. The argument proves too much. Whenever an agency's actions are opened to public view, the agency exposes itself to pressure and criticism. Since 1976, redacted Technical Advice Memoranda have been made available to the public. *See* 26 U.S.C. § 6110. Yet the IRS has offered no evidence that disclosing technical advice pursuant to § 6110 has harmed the agency or has inhibited it in reaching legal judgments. FSAs and Technical Advice Memoranda are, as we have already mentioned, quite similar in purpose, in organization, and in content.[10] Both types of documents reflect the law the government is actually applying in its dealings with the taxpaying public. *See Coastal States,* 617 F.2d at 869. True, FSAs differ in that they are not formally binding on the field offices. But if disclosing Technical Advice Memoranda has not damaged the functioning of the Office of Chief Counsel or the IRS, there is no basis for supposing that disclosing FSAs would.

The government points out that in addition to the protection of agency decision making, we have also identified as purposes of the deliberative process privilege "protect[ion] against premature disclosure of proposed policies" and "protect[ion] against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action," *Coastal States,* 617 F.2d at 866. Neither of these purposes warrants a cloak of secrecy around FSAs. As discussed above, FSAs are statements of the agency's legal position, and there is nothing premature or misleading about disclosing them. Even if an FSA reflects a view eventually rejected by a field official, it still represents the opinion of the national office of the Office of Chief Counsel, and the public can only be enlightened by knowing what the national office believes the law to be.

### 2. Attorney–Client Privilege

■ The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services. *In re Sealed Case,* 737 F.2d 94, 98–99 (D.C.Cir. 1984). The privilege also protects communications from attorneys to their clients if the communications "rest on confidential information obtained from the client." *Id.* at 99; *see also Mead Data Cent.,* 566 F.2d at 254. In the governmental context, the "client" may be the agency and the attorney may be an agency lawyer. The IRS claims that FSAs are confidential communications between attorneys in the Office of Chief Counsel and their clients (the requesters), and are based upon confidential information relayed from the requesters to the attorneys.

In light of our decision about exemption 3, the issue here is not whether the IRS must disclose taxpayer-specific information. Wholly aside from the attorney-client privilege, such information must be redacted from FSAs because it is "return information" protected by § 6103. As to application of the privilege to the remaining portions of the FSAs relating to individual taxpayers and to the approximately 112 FSAs relating to classes of taxpayers, *see supra* note 6, our decisions in *Schlefer v. United States,* 702 F.2d 233 (D.C.Cir.1983), and *Coastal States* are controlling.

10. In an affidavit, an Assistant Chief Counsel asserts that FSAs and Technical Advice Memoranda "differ greatly in content." But he fails to identify any great differences. He states that Technical Advice Memoranda concern the "interpretation and proper application of tax law, tax treaties, regulations, revenue rulings, notices, and other precedents." On the other hand, FSAs involve "a much wider range of authority," including "the Internal Revenue Code and other federal statutes, and rules of procedure for federal courts." FSAs, he continues, discuss judicial opinions "rather than ... agency regulations, rulings, or notices." Are we to suppose that Technical Advice Memoranda are not concerned with judicial opinions? A Supreme Court decision interpreting a section of the Internal Revenue Code is as much a part of "tax law" as an IRS regulation. And in fact hundreds of Technical Advice Memoranda do discuss Supreme Court cases, to say nothing of cases from other courts. *E.g.,* Tech. Adv. Mem. 9721002 (May 23, 1997); Tech. Adv. Mem. 9717006 (Apr. 25, 1997).

*Schlefer* dealt with documents containing legal advice from an agency's chief counsel to agency officials. The officials sought legal guidance to assist them in ruling on requests from "outsiders." 702 F.2d at 235–36. We held that the documents had to be disclosed under FOIA and were not protected by the attorney-client privilege. *Id.* at 245. "The outsider's communications to the official do not contain any confidential information *concerning the Agency;* when the official transmits the relevant facts to the Chief Counsel, no new or confidential information *concerning the Agency* is imparted.... Accordingly, [the documents] do not fall within the scope of the attorney-client privilege and are not within FOIA exemption 5." *Id.* (footnote omitted). The IRS acknowledges *Schlefer* but makes not the slightest attempt to distinguish it. The case is, we believe, directly on point and we therefore must follow it. To the extent that the legal conclusions in FSAs are based upon information obtained from taxpayers, *Schlefer* holds that the attorney-client privilege does not apply.

*Coastal States* leads to the same conclusion. We there held that when agency auditors communicate information from third parties to the agency's regional counsel and ask for legal advice, the regional counsel's written responses containing "neutral, objective analyses of agency regulations" are not privileged. 617 F.2d at 863. The IRS does attempt to distinguish *Coastal States*. There is no evidence, the IRS tells us, that FSAs contain "neutral, objective analyses" of the tax laws; rather "FSAs provide case-specific advice on substantive and procedural matters." There are several problems with the IRS's distinction. The first is that "case-specific" and "objective" are not mutually exclusive. Are we to suppose that the Office of Chief Counsel decides what the law is or should be on the basis of how much tax revenue can be squeezed out of the particular taxpayer who is being audited? Government officials serve the public; they have a responsibility to be objective in applying the law, whether they are dealing with an individual taxpayer or a class of taxpayers. Unless they operate objectively the law cannot be applied uniformly and consistently—the very ends FSAs are intended to promote. The

second thing wrong with the IRS's argument is that it misconceives where the burden lies. The IRS is invoking a FOIA exemption. It had the burden of proving that the exemption warranted its withholding of the documents. If there is no evidence to show whether FSAs are of the same character as the documents before the court in *Coastal States,* that is a strike against the IRS, not in favor of it. Furthermore, we are at a loss to understand why, as the IRS proposes, the existence of the attorney-client privilege turns on whether the lawyer's advice may be characterized as "objective." Private attorneys, one would hope, usually give objective advice to their clients. That does not deprive their communications of the privilege's protections. But no private attorney has the power to formulate the law to be applied to others. Matters are different in the governmental context, when the counsel rendering the legal opinion in effect is making law. Here, the Office of Chief Counsel is one of the principal tax lawgivers within the Executive Branch. Nearly all the interpretations of the tax laws the IRS applies in assessing and collecting taxes emanate from the Office of Chief Counsel. The Office drafts formal regulations (Treasury Decisions), Revenue Rulings, Private Letter Rulings, Technical Advice Memoranda, Treasury Memoranda, General Counsel Memoranda and Actions on Decisions. *See TWRF,* 646 F.2d at 669–73. As we have discussed previously, FSAs issued by the Chief Counsel create a body of private law, applied routinely as the government's legal position in its dealings with taxpayers. It is this quality, not the objective character of the legal analyses in the documents, that *Schlefer* and *Coastal States* deem significant. *See also Niemeier v. Watergate Special Prosecution Force,* 565 F.2d 967, 974 (7th Cir.1977); *Falcone v. IRS,* 479 F.Supp. 985, 989–90 (E.D.Mich.1979); *cf. Sterling Drug Inc. v. FTC,* 450 F.2d 698, 708 (D.C.Cir.1971). Under those decisions, FOIA exemption 5 and the attorney-client privilege may not be used to protect this growing body of agency law from disclosure to the public.

The IRS suggests that some FSAs may reveal confidential information transmitted

by field personnel regarding "the scope, direction, or emphasis of audit activity." Communications revealing such client confidences are in a different category than those we have been discussing. They are clearly covered by the attorney-client privilege, and the IRS may still assert the privilege with respect to particular portions of FSAs containing this sort of confidential government information.

### 3. Work Product Doctrine

 The work product doctrine shields materials "prepared in anticipation of litigation or for trial by or for [a] party or by or for that ... party's representative (including the ... party's attorney, consultant, ... or agent)." FED.R.CIV.P. 26(b)(3); *see also Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The IRS has identified 309 of the FSAs as attorney work product. There is no dispute that these FSAs are protected under exemption 5, and the district court properly permitted the government to redact "all attorney work-product." However, in making this ruling the district court confined the scope of the work product doctrine too narrowly. It said the IRS "may exclude *only* ... text concerning 'the mental impressions, conclusions, opinions, or legal theories of an attorney.'" The work product doctrine protects such deliberative materials but it also protects factual materials prepared in anticipation of litigation. *See, e.g., Martin v. Office of Special Counsel,* 819 F.2d 1181, 1184–87 (D.C.Cir. 1987); *A. Michael's Piano, Inc. v. FTC,* 18 F.3d 138, 147 (2d Cir.1994).[11] Any part of an FSA prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5.

### IV

We agree with the district court that no blanket exemption applies to all of the requested FSAs, and they must be released to Tax Analysts except to the extent that they are protected by some specific FOIA exemption. As the district court ordered, the IRS may redact any true return information or attorney work product from the FSAs.

Other grounds for withholding certain FSAs or portions of FSAs may also apply. The IRS may redact matters that are properly within the scope of the attorney-client privilege consistent with what we said above. The IRS claims that portions of 32 of the FSAs fall under exemption 3 due to secrecy clauses in tax treaties and tax information exchange agreements. It says that portions of 206 of the FSAs are protected by exemption 7(E), which applies to materials that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E). And it contends that one FSA falls under exemption 6, which shields "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," *id.* § 552(b)(6). The district court did not pass on these claims, and Tax Analysts raises some doubt about whether the government properly presented them. We remand the case to the district court so it may consider these issues.

*So ordered.*

### Appendix

(*See supra* note 1.)

*ADDITIONS TO TAX, PENALTIES, APPLICATION OF NEGLIGENCE TO CAR-*

---

**11.** Federal Rule of Civil Procedure 26(b)(3) allows discovery of materials prepared in anticipation of litigation only upon a showing of "substantial need," but in all cases "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney ... concerning the litigation." The point of the rule is that while all materials prepared in anticipation of litigation are work product and protected from discovery by other parties, a sufficient showing of need may overcome that protection with respect to factual materials, but not with respect to deliberative materials. This does not mean that factual materials are not work product; it means only that they receive a lower degree of protection under the Federal Rules than deliberative work product.

*RYBACK YEARS*: The addition to tax under I.R.C. § 6653(a)(2) may not be asserted on the basis of an NOL carryback in a tax year for which the tax is due prior to December 31, 1981.

From 1954 until 1982, the addition to tax under I.R.C. § 6653(a) applied where any part of an underpayment was due to negligence. Section 6653 was amended by the Economic Recovery Tax Act of 1981 (ERTA), Pub.L. No. 34, HR 4242, 97th Cong., 1st Sess. The effective rate of the addition was increased by adding to it an amount equal to 50 percent of the interest on the negligence-tainted portion of the deficiency. Section 6653(a)(2) was enacted to apply the interest component.

In this case, the taxpayers claimed NOL carrybacks, arising from a tax shelter in 1983, on their 1980 tax returns. The Service issued penalty-only notices of deficiency for 1980, asserting additions under I.R.C. §§ 6653(a)(1) and (a)(2). Section 722(b)(2) of ERTA states that the interest element of the addition applies "to taxes the last date prescribed for payment of which is after December 31, 1981." Payment of the taxpayers' 1980 tax was due by April 15, 1981.

The General Explanation of the Economic Recovery Tax Act of 1981 prepared by the staff of the Joint Committee on Taxation provides that section 6653(a)(2) applies "for the period beginning on the last day for payment of the underpayment (*i.e.*, the due date of the return without regard to any extension of time for payment) and ending on the date of the assessment." This language supports that whether section 6653(a)(2) applies to an underpayment is determined by when the related tax return and payment are due.

*Handel v. Commissioner*, T.C. Memo. 1992–355, and *Thomas Nelson, Inc. v. United States*, 734 F.Supp. 810 (M.D.Tenn.1989), involve carrybacks and section 6653 additions to tax for years pre- and post-enactment of the interest component. Neither case directly addresses the propriety of applying section 6653(a)(2) to the earlier tax years. In both cases, however, the Service applied section 6653(a)(2) only to the later years.

The regulations for the accuracy-related negligence penalty under section 6662(c) include a special transitional rule for carrybacks. The inference taken from the regulation is that absent a special rule the negligence penalty or addition in effect for the carryback year applies to the underpayment attributable to the carryback. There is no similar special rule for I.R.C. § 6653(a)(2).

For further information, please contact....