# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 4, 2005            Decided June 3, 2005

No. 03-1308

CITY OF NAPLES AIRPORT AUTHORITY,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

———

On Petition for Review of a Decision of the
Federal Aviation Administration

———

*W. Eric Pilsk* argued the cause for petitioner.  With him on the briefs were *Perry M. Rosen*, *Peter J. Kirsch*, *Lori Potter*, *Daniel S. Reimer*, and *F. Joseph McMackin, III.*

*Thomas R. Devine*, *Arthur P. Berg*, and *Patricia A. Hahn* were on the brief for *amicus curiae* Airports Council International -- North America in support of petitioner.  *David T. Ralston, Jr.* entered an appearance.

*Richard Baron* was on the brief for *amicus curiae* Quiet Technologies, Inc. in support of petitioner.

*Robert D. Pritt* and *David C. Weigel* were on the brief for *amici curiae* City of Naples and Collier County in support of petitioner.

*John A. Bryson*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Ellen J. Durkee*, Attorney. *Andrew C. Mergen*, *Lisa E. Jones*, and *Ronald M. Spritzer*, Attorneys, entered appearances.

*Kathleen A. Yodice*, *Robert E. Doyle, Jr.*, *Daniel B. Rosenthal*, *David P. Murray*, *David A. Berg*, *Frank J. Costello, Jr.*, and *Scott M. Zimmerman* were on the brief of *amici curiae* Aircraft Owners and Pilots Association, Inc., *et al.* in support of respondent. *Meredith L. Flax* and *Thomas Richichi* entered appearances.

Before: RANDOLPH and ROBERTS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: This is a petition for judicial review of an order of the Associate Administrator of the Federal Aviation Administration -- the FAA -- disqualifying the City of Naples Airport Authority from receiving grants under the Airport and Airway Improvement Act of 1982, 49 U.S.C. § 47107 *et seq.* (the "Improvement Act"). In order to be eligible for grants, an airport must be "available for public use on reasonable conditions and without unjust discrimination." 49 U.S.C. § 47107(a)(1). The FAA determined that a noise restriction on certain aircraft imposed an unreasonable condition on public use of the Naples Municipal Airport.

The City of Naples is a southern Florida community, bounded on three sides by Collier County and on the west by the Gulf of Mexico. It has 23,000 permanent residents and 13,000 seasonal residents. The Naples airport is located within the city's boundaries. Portions of the airport abut the county line. The city leases the land to the Airport Authority, a five-member

independent entity created by the Florida legislature for the purpose of operating and maintaining the Airport.

Neither the city nor the county provides funds to subsidize the airport, and no tax or other fiscal revenues are earmarked for the airport. The Airport Authority has no zoning power. The city is responsible for zoning in the areas surrounding the airport within its municipal boundary. The county is responsible for zoning all other property immediately adjacent to the airport.

In 1999, in response to complaints from residents, the Airport Authority commissioned a study to examine noise exposure from aircraft in the area surrounding the airport. The Airport Noise and Capacity Act of 1990, 49 U.S.C. § 47521 *et seq.* -- the Noise Act -- governs the manner in which individual airports may adopt noise restrictions on aircraft. Aircraft are classified roughly according to the amount of noise they produce, from Stage 1 for the noisiest to Stage 3 for those that are relatively quieter. Section 47524(b) of the Noise Act sets forth certain procedural requirements with which an airport must comply in order to restrict Stage 2 aircraft. Section 47524(c) contains similar procedural requirements for restrictions on Stage 3 aircraft, but also requires FAA approval of any Stage 3 restriction.

The Airport Authority's study found that approximately 1,400 residents were exposed to noise levels in excess of DNL 60 dB[*] and that a restriction on all Stage 2 aircraft would affect

---

[*] Sound pressure is measured in decibels ("dB"). The Day-Night Average Sound Level ("DNL") is a widely used measure of noise exposure; it is equal to the steady noise level occurring during a 24-hour period, adjusting all noise occurring between 10:00 p.m. and 7:00 a.m. upward by ten decibels to account for increased sensitivity to noise during that time. 49 Fed. Reg. 49,260, 49,270 (Dec. 18, 1984).

only one percent of aircraft operations at the airport, while considerably reducing the number of people exposed to significant noise levels. Effective January 1, 2001, the Airport Authority adopted a ban against all Stage 2 aircraft.

Although the Airport Authority complied with the procedural requirements of § 47524(b) of the Noise Act, the FAA ruled that the Stage 2 ban was "unreasonable" and, therefore, contrary to the Airport Authority's obligation under § 47107(a)(1) of the Improvement Act. In the FAA's view, the Airport Authority failed to show that "noncompatible land uses exist in the DNL 60 dB contour."

The Airport Authority maintains § 47524(b) of the Noise Act removed the FAA's power to withhold grants on the basis of an "unreasonable" Stage 2 ban. There is no dispute that before passage of the Noise Act in 1990, the FAA could withhold grants if an airport operator's noise restriction violated the grant assurances in § 47107 of the Improvement Act. *See City & County of San Francisco v. FAA*, 942 F.2d 1391, 1394-95 (9th Cir. 1991). Under § 47533 -- the savings clause of the Noise Act -- the law in effect before its enactment shall remain unaffected, "[e]xcept as provided by section 47524." 49 U.S.C. § 47533(1).

Although § 47524 of the Noise Act is silent about grant eligibility in the face of a Stage 2 restriction, the Airport Authority claims the provision removed the FAA's pre-existing power to withhold grants when such a restriction proved unreasonable. One of the arguments is framed this way: If Congress had wanted to allow FAA review of such restrictions, Congress knew how to say as much. As cast, the "argument is weak." *Doris Day Animal League v. Veneman*, 315 F.3d 297, 299 (D.C. Cir. 2003). It may "be made in any case in which there is a fair dispute about the meaning of a statute." *Id.*

"Congress almost always could write a provision in a way more clearly favoring one side -- or the other . . .. Its failure to speak with clarity signifies only that there is room for disagreement about the statute's meaning." *Id.*

If § 47524(b) did not preclude FAA substantive review of Stage 2 noise restrictions, the Authority continues, there is no explaining § 47524(c). Subsection (c) requires (with an exception) the FAA to find a Stage 3 restriction "reasonable" and not an undue burden on interstate commerce before it can become effective. If the FAA already could review Stage 3 restrictions for reasonableness when it doled out grants pursuant to the Improvement Act, § 47524(c) would be "surplusage." Brief of Petitioner at 30. This would be a fair argument if the premise were accurate. But it is not. On its face, § 47524(c) gives the FAA considerably more power than it had when reviewing an airport operator's Stage 3 restriction at the grant stage. For one thing, the Stage 3 restriction cannot go into effect without the FAA's say-so. For another thing, subsection (c)'s requirement of FAA approval is not tied to grants; grants or not, no airport operator can impose a Stage 3 restriction unless the FAA gives its approval.

Still, the Authority has a point. Because in one subsection Congress explicitly required FAA approval of Stage 3 restrictions but in another subsection did not provide for substantive review of Stage 2 restrictions, this is some indication that Congress intended to allow airport operators to promulgate Stage 2 restrictions free from FAA review. *See Russello v. United States*, 464 U.S. 16, 23 (1983). But there is a contrary inference one may draw from another subsection of § 47524 of the Noise Act. Section 47524(e) states that when an airport operator adopts an FAA-approved Stage 3 restriction in compliance with § 47524(c), the operator becomes eligible for grants under the Improvement Act. In other words, the FAA

may not withhold grants under the Improvement Act on the basis of a Stage 3 noise restriction imposed under § 47524(c) of the Noise Act. No similar provision exists for Stage 2 restrictions. In the absence of such a provision, one may infer that Congress intended to continue allowing the FAA to withhold grants on the basis of a Stage 2 restriction even if the operator complies with the procedural requirements of § 47524(b).

The Airport Authority also invokes some legislative history of the Noise Act. Congress considered but did not enact other versions of the Noise Act requiring FAA review of Stage 2 restrictions and conditioning grant eligibility on compliance with these requirements. 136 CONG. REC. 25,376-82 (1990) (Senate Bill 3094). The Authority also points to an exchange between Senators Lautenberg and Ford in committee to show that Congress understood an airport operator would be permitted to impose restrictions on Stage 2 aircraft without FAA approval and "without risking the loss of" grants under the Improvement Act. 136 CONG. REC. 36,252 (1990). These excerpts are not particularly telling. Both speak only to the FAA's power under § 47524; neither deals with the FAA's pre-existing power to withhold grants under § 47107(a)(1).

Because the Noise Act does not clearly reveal whether the FAA may withhold grants when an airport operator imposes an unreasonable Stage 2 noise restriction, we shall defer to the FAA's determination that it retains that power under the Improvement Act. The agency's interpretation is linguistically permissible, and it represents a reasonable resolution of statutory uncertainty, particularly in light of § 47524(e) of the Noise Act and its savings clause in § 47533. *See Tax Analysts v. IRS*, 117 F.3d 607, 613-16 (D.C. Cir. 1997).

The question remains whether there is substantial evidence to support the FAA's ruling that the Authority's Stage 2 ban is unreasonable, or whether the FAA acted arbitrarily and capriciously, which amounts to the same thing in this context. *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984). The ruling rested on the FAA's finding that noise levels between DNL 60 dB and DNL 65 dB were not incompatible with residential land use near the airport. The FAA promulgated non-binding guidelines regarding noise levels and land use in 1984. Those guidelines stated that levels below DNL 65 dB are generally compatible with all land use. Generally means not always. The guidelines thus acknowledged that "responsibility for determining the acceptable and permissible land uses and the relationship between specific properties and specific noise contours rests with the local authorities," to which the FAA added that its guidelines "are not intended to substitute federally determined land uses for those determined to be appropriate by local authorities in response to locally determined needs and values in achieving noise compatible land uses." 49 Fed. Reg. 49,260, 49,275 (Dec. 18, 1984).

The FAA cited two reasons why the Airport Authority's selection of DNL 60 dB as the maximum acceptable noise level was unreasonable: (1) local ordinances did not "unequivocally prohibit" development in areas subjected to noise levels of DNL 60 dB or higher; and (2) the area presently subjected to DNL 60 dB was not "uniquely quiet."

As to the first, the FAA found that the City of Naples did not really believe that DNL 60 dB exposed residents to a significant noise level because it had not completely banned development in the DNL 60 dB contour. (The evidence showed, however, that neither the city nor the county had approved any residential development in that area after the Airport Authority

completed the study of sound levels. Amici Brief of City of Naples and Collier County at 14.) If the city did not believe that DNL 60 dB was a "significant noise threshold," the FAA reasoned, then the Airport Authority failed to demonstrate that "a land use compatibility problem exists in the DNL 60 dB" area. Without explaining how a local government could demonstrate the existence of a land use compatibility problem, the FAA stated that the City of Naples had merely adopted the DNL 60 dB level as a prophylactic against airport expansion and land use in the DNL 65 dB area. But there is no evidence -- aside from speculation by an FAA employee -- to support the FAA's conclusion about the city's motives. The record shows that during these proceedings the City of Naples did adopt an ordinance forbidding all noise in excess of DNL 60 dB, including music and construction equipment; that the area is a retirement community; that the area is one of outdoor living; and that aircraft noise is the leading cause of noise complaints. This evidence, much of which the FAA never addressed, all supports the conclusion that DNL 60 dB level is considered a significant noise threshold in the City of Naples.

There is also substantial evidence, including sound measurement data from the Airport Authority study, that Naples is a quiet community. The FAA concluded that the area is not "uniquely quiet," but it did not define what it meant by "uniquely." The FAA provided no data to contradict the study data. It did not perform any sound analysis. And it did not otherwise collect information on the subject. The FAA's Director of Airport Safety and Standards "inferred" from the fact that some residents lived in multi-family dwellings near multi-lane roads that the area was not "uniquely quiet," and the FAA's final decision simply stated that this "inference" was "reasonable." No mention of the sound measurement data was made.

The amici brief of the City of Naples and Collier County forcefully summarizes the state of the record. "Even if it had defined the term 'uniquely quiet', the FAA did not cite any factual support for its finding that [Naples is] not a 'uniquely quiet' community. The FAA did not visit the area as part of its investigation, did not perform any analysis of the local soundscape, did not contact any residents or local officials to obtain any information on this subject, and did not cross-examine the principal author of the Part 161 Study on this subject. Instead, the FAA Associate Administrator relied on the anecdotal information that there was some noise in the area -- largely the typical suburban noise associated with streets and shops -- in an attempt to establish that ambient noise levels must have been high. Moreover, the Associate Administrator ignored the Airport Authority Executive Director's actual testimony, wherein he explained that the existence of multi-family housing, streets and shops did not negate the quiet nature of the community.

"From this and other evidence, the Associate Administrator should have concluded that [the Naples] community revolves around this particular environment, that [its] economy is based almost entirely on the climate and amenities offered by [its] outdoor environment, and that [its] residents and visitors have an expectation of quiet throughout virtually the entire community. There was absolutely no basis for the Associate Administrator to conclude that the sound environment in this community does not support the Airport Authority's decision to ban Stage 2 aircraft." Amici Brief of City of Naples and Collier County at 19-20.

The Airport Authority and the City of Naples introduced ample evidence -- much of which went unrebutted -- demonstrating that the Stage 2 ban was justified. Because the FAA's conclusion to the contrary is not supported by substantial

evidence, the petition for review is granted, the FAA's order is vacated, and the case is remanded to the FAA.

*So ordered.*