PUBLIC CITIZEN HEALTH
RESEARCH GROUP,
Plaintiff,

v.

FOOD AND DRUG ADMINISTRATION,
Defendant,

HOECHST MARION ROUSSEL, INC.,
and SCHERING CORPORATION,
Defendant–Intervenors.

No. CIV. A. 94–0018 (RCL).

United States District Court,
District of Columbia.

March 11, 1998.

&#9758;63

Lucinda Sikes, Brian Wolfman, Public Citizen Litigation Group, Washington, DC, for Plaintiff.

Marina Utgoff Braswell, AUSA, U.S. Attorney's Office, Washington, DC, Lori Knight, Office of Chief Counsel, Food & Drug Administration, Rockville, MD, for FDA.

Kinsey S. Reagan, Stacy L. Ehrlich, Kleinfeld, Kaplan & Becker, Washington, DC, for Intervenor Defendant, Hoechst Marion Roussel, Inc.

Robert P. Reznick, Hughes, Hubbard & Redd, LLP, Washington, DC, for Intervenor Defendant Schering Corp.

## *MEMORANDUM OPINION*

LAMBERTH, District Judge.

This matter comes before the court on the parties' cross motions for summary judgment. Based upon the memoranda in support of and in opposition to the cross-motions, the entire record thereto and the relevant law, plaintiff's motion will be granted in part and denied in part; defendant FDA's motion will be denied in part and granted in part; defendant Schering Corporation's motion will be denied in full and defendant Hoechst Marion Roussel's motion will be granted in full.

## I. BACKGROUND

### A. Factual and Procedural History

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *as amended,* by plaintiff Public Citizen Health Research Group ("Public Citizen") to compel production of records concerning pre-clinical and clinical studies for four experimental prescription drugs. For each of the drugs subject to the request, clinical trials were discontinued because of the death or serious injury of patients, or because of safety concerns arising out of pre-clinical studies.

Public Citizen Health Research Group, a non-profit consumer advocacy organization devoted to promoting and protecting consumer health and safety, requested the data at issue in order to review whether FDA processes and procedures safeguard the health of human subjects who participate in drug trials. After some dispute as to whether FDA had a central file responsive to the initial letter request, the Food and Drug Administration ("FDA") identified 230 Investigational New Drug Applications ("IND"s) that were discontinued because of safety concerns between the dates of January 1, 1990, and July 12, 1993. FDA initially claimed that Public Citizen's request had failed to reasonably describe the records sought and moved to dismiss on that basis; this court denied FDA's motion and ordered the parties to reach an agreement on the search to be conducted. *See* Memorandum and Order, February 9, 1996. The FDA subsequently identified 14 of the 230 IND files as responsive to Public Citizen's FOIA request, but then contended that none of the documents in the 14 INDs could be released to Public Citizen because the sponsors notified FDA of their continuing proprietary interest in the data and information contained therein. *See* Letter from James A. O'Hara III, Associate Commissioner, FDA, to Brian Wolfman, Public Citizen (September 20, 1996) at 2. Specifically, FDA noted, "We have withheld the data and information obtained from the IND sponsors because these records consist of confidential commercial and/or trade secret data and information, the public disclosure of which would likely cause substantial harm to the competitive position of the sponsors of the INDs." *Id.*

Three of the six IND sponsors—Abbott Laboratories, Astra U.S.A. and Wyeth–Ayerst—withdrew their objections to disclosure of the responsive records, and 13,626 pages of information on the investigational drugs' pre-clinical and clinical testing was forwarded to Public Citizen with limited redactions to protect personal privacy. Three other sponsors—Hoechst Marion (subsequently Hoechst Marion Roussel ("HMR")), The R.W. Johnson Pharmaceutical Research Institute, and Schering Corporation moved to intervene as defendants. Plaintiff entered into settlement discussions with R.W. Johnson, and, as a result of those discussions, obtained the vast majority of responsive documents sought. R.W. Johnson was thereafter dismissed as a party to this action. *See* Stipulation of Settlement and Dismissal as to Defendant–Intervenor R.W. Johnson Pharmaceutical Research Institute, April 22, 1997. Only Schering and HMR remain as intervenor-defendants in this matter; Schering has five contested INDs, and HMR has one.

### B. The Regulatory and Statutory Framework -

Before a new drug may be marketed in the United States, it must be approved by the FDA. *See* 21 U.S.C. § 355(a); 21 C.F.R. part 314. The FDA will grant approval if the drug has been demonstrated to be safe and effective for its intended use on the basis of laboratory, animal and human testing. *See* 21 U.S.C. § 355(d). The approval process occurs in two steps.

First, the sponsor gathers data about the drug's safety and effectiveness through pre-clinical (animal) and clinical (human) studies. Clinical studies may be commenced only after the sponsor has submitted an IND to FDA. 21 U.S.C. § 355(i)(1); 21 C.F.R. pt. 312. The IND must include the sponsor's pharmacological and toxicological studies of the drug, proposed clinical study protocols, chemistry manufacturing and control information, and summaries of previous human experiences with the drug on the basis of which FDA determines whether it is safe to conduct the proposed studies on humans. 21

C.F.R. § 312.23(a)(6)-(9). If FDA determines that the drug does not pose an unreasonable or significant risk to human subjects, the sponsor is permitted to go forward with the clinical trials.

The authority to conduct clinical trials of investigational drugs may be withdrawn, suspended or terminated at any time during the investigation based upon a request of the sponsor or order of FDA. *See* 21 C.F.R. §§ 312.42, 312.44, and 312.45. Many INDs are withdrawn by sponsors or become inactive because sponsors fail to pursue the development of the project. A sponsor may elect to withdraw its application for a variety of reasons, including, but not limited to, disappointing trial results, faulty study design, changed market conditions, lack of commercial interest, or deaths, serious injury or adverse drug reactions. *See* Supplemental Declaration of Carolann W. Hooton ("Supplemental Hooton Declaration") ¶ 11. The FDA may terminate an IND for a variety of reasons, including concerns about the study protocol, inadequate investigations supporting human testing, or adverse effects in trial participants. *See* 21 C.F.R. § 312.44. Or, the agency may temporarily suspend an investigation by placing it on "clinical hold." 21 C.F.R. § 312.42. Some INDs placed on clinical hold are ultimately withdrawn, while others become active again. Supplemental Hooton Declaration ¶ 13.

In the second stage of the drug development process, a sponsor presents to FDA the results of the clinical trials conducted under the IND, together with other information and data, in a formal New Drug Application (NDA). 21 U.S.C. § 355(b); 21 C.F.R. pt. 314. Agency reviewers evaluate all of the data in the NDA, including the results from the clinical trials under the IND, and determine whether the drug is safe and effective for its intended use.

Disclosure of safety and effectiveness data is governed by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(*l*), and agency regulations. Under the statute and the FDA regulations, safety and effectiveness data which has been supplied in an application "shall be made available to the public, upon request, unless extraordinary circumstances are shown" under five conditions, one of which is if "no work is being done or will be undertaken to have the application approved." 21 U.S.C. § 355(*l*)(1); 21 C.F.R. § 314.430(f)(1).

## II. ARGUMENT

■ Summary judgment in a FOIA action is appropriate when the pleadings together with the declarations show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Alyeska Pipeline Serv. Co. v. U.S. EPA,* 856 F.2d 309, 313 (D.C.Cir.1988) (mere conflict in affidavits not sufficient to preclude an award of summary judgment); *Weisberg v. U.S. Department of Justice,* 627 F.2d 365, 368 (D.C.Cir.1980). In a FOIA action, the burden of justifying nondisclosure is on the agency and a district court is to determine the matter de novo. *See* 5 U.S.C. § 552(a)(4)(B); *Department of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 755, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).

■ In order to sustain its burden of proof in a FOIA case, the agency may rely upon the declarations of agency officials to show that its search was reasonable and that any withheld documents fall within one of the nine enumerated FOIA exceptions. *See Oglesby v. Department of the Army,* 920 F.2d 57, 68 (D.C.Cir.1990); *Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978). The declarations submitted by the agency are to be accorded a presumption of expertise. *Pharmaceutical Manufacturers Ass'n v. Weinberger,* 411 F.Supp. 576, 578 (D.D.C.1976). However, the declarations must be clear, specific and adequately detailed; they must describe the withheld information and the reason for nondisclosure in a factual and nonconclusory manner; and they must be submitted in good faith. *See Hayden v. NSA,* 608 F.2d 1381, 1387 (D.C.Cir.1979). Unless the affidavits are deficient, the court need not conduct further inquiry into their veracity. *Id.* at 1387. The most commonly used device supporting an agency's summary

judgment motion is the *Vaughn* index, which correlates each withheld document with a specific FOIA exemption, allowing the court to determine if the exemptions are validly asserted without having to physically inspect each of the documents. A *Vaughn* index also gives the opposing party some basis on which to oppose the motion. *See Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973). To have a triable issue of material fact that will preclude the award of summary judgment, the plaintiff must show that the claimed exemption is improperly asserted.

The purpose of FOIA is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). FOIA is a pro-disclosure statute, and agency records must be disclosed when properly requested unless exempt under one of nine enumerated exemptions or specifically excluded from the act's coverage. *See* 5 U.S.C. § 552(a); *NLRB v. Sears, Roebuck and Co.,* 421 U.S. 132, 136, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

In this matter, FDA, Schering and HMR rely upon Exemption 4, 5 U.S.C. § 552(b)(4), as the basis for non-disclosure.[1] Exemption 4 protects from disclosure (i) commercial or financial information, (ii) obtained from a person, (iii) that is privileged or confidential.[2] *National Parks and Conservation Ass'n v. Morton,* 498 F.2d 765

(D.C.Cir.1974) It is undisputed that prongs one and two of the *National Parks* test are satisfied. *See, e.g.*, *Public Citizen,* 704 F.2d at 1290 (holding that the term "commercial" is not confined to records that reveal basic commercial operations and that drug manufacturers have a commercial interest in health and safety information concerning their products, and that such documents are submitted by a person); *see also Public Citizen Health Research Group v. Food and Drug Administration,* 964 F.Supp. 413, 414 (D.D.C.1997). Whether commercial or financial information is confidential is dependent upon whether disclosure of that information will either (i) impair the government's ability to obtain necessary information in the future or (ii) cause substantial harm to the competitive position of the person who submitted the information. See *National Parks* 498 F.2d at 770.[3] In this matter, the parties properly focus their attention upon the "substantial competitive harm" element of the test. *See Public Citizen,* 704 F.2d at 1290–91, 1291 n. 29; *Public Citizen,* 964 F.Supp. at 415 (noting that any arguments about impairment were unjustified). In order to support the withholding of documents under the substantial competitive harm prong, the party seeking to prevent disclosure "need not 'show actual competitive harm'; evidence revealing '[a]ctual competition and the likelihood of substantial competitive injury' is sufficient to bring commercial information within the realm of confidentiality." *Public Citizen,* 704 F.2d at 1291 (quoting *Gulf & Western Indus-*

---

1. In its Memorandum in Support of Summary Judgment, defendant FDA claimed that certain documents in the HMR IND were withheld because they fell under exemption 5 of FOIA, which addresses "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency." Plaintiff did not challenge the assertion of exemption 5 with regard to these ten documents. Plaintiff's Memorandum at 8 n. 3.

2. Exemption 4 also addresses "trade secrets," and, at one time, the FDA took the position that the type of safety and effectiveness data sought in this request constituted trade secrets within the meaning of exemption 4. However, the D.C. Circuit rejected this view in *Public Citizen Health Research Group v. FDA,* 704 F.2d 1280, 1288–89 (D.C.Cir.1983), and the FDA has followed this decision ever since, *see* 59 Fed.Reg. 531, 532

(1994). Plaintiff does not challenge the redaction of trade secret information such as chemistry, manufacturing and control information from the requested documents under exemption 4, in light of the definition of "trade secret" that this circuit and the FDA have adopted. Plaintiff's Memorandum at 14 n. 7.

3. The *National Parks* test is applicable because the challenged information was required to be submitted pursuant to statute, regulation or some less formal mandate. *See Critical Mass Energy Project v. Nuclear Regulatory Commission,* 975 F.2d 871, 878 (D.C.Cir.1992) (drawing a distinction between information required to be submitted to an agency and information provided voluntarily for purposes of determining whether the information is "confidential"); *Public Citizen,* 964 F.Supp. at 414 n. 1 (applying *Critical Mass* in the drug application/FOIA context).

*tries, Inc. v. United States,* 615 F.2d 527, 530 (D.C.Cir.1979)).

Plaintiff Public Citizen contends that the information sought is not exempt from disclosure, and offers two arguments in support. First, typical to almost all exemption 4 disputes, it contends that defendant and defendant-intervenors have not, based on the materials submitted to the court, adequately sustained their burden of showing "a likelihood of substantial competitive injury" from release of the data. (The existence of "actual competition" in the pharmaceutical industry is not contested.) Second, Public Citizen looks to the FDA regulations concerning release of safety and effectiveness data upon abandonment of an application—and the subsequent codification of those regulations by Congress—as separate grounds directing disclosure. Public Citizen notes that safety and effectiveness data on abandoned INDs must be made public except in "extraordinary circumstances" and goes on to assert that the requirement of "extraordinary circumstances" must be construed to be a higher threshold than a "likelihood of substantial commercial harm." Defendant and defendant-intervenors counter this latter claim by arguing that reliance upon 21 U.S.C. § 355(*l*) and 21 C.F.R. § 314.430 is misplaced. And, even if not misplaced, they claim that those provisions do not create a more liberal disclosure policy because "extraordinary circumstances" should be interpreted as coextensive with a "likelihood of substantial competitive injury." Because the success or failure in adequately demonstrating a likelihood of substantial competitive harm under FOIA exemption 4 affects the latter inquiry, both contentions will both be addressed by the court.

A. Have Defendants Sustained Their Burden of Showing How Release of the Requested Information Will Cause a "Likelihood of Substantial Competitive Harm"?

This circuit has previously recognized that the type of safety and effectiveness information at issue in Public Citizen's request may be of great assistance to competing drug manufacturers, and therefore a potential cause of "substantial commercial injury" as those terms are understood for exemption 4

purposes. In *Webb v. HHS,* 696 F.2d 101, 103 (D.C.Cir.1982), the court noted:

a drug manufacturer which has submitted an NDA has a competitive interest in seeing that the information contained in its NDA is not prematurely released to the public. If a manufacturer's competitor could obtain all the data in the manufacturer's NDA, it could utilize them in its own NDA without incurring the time, labor, risk, and expense involved in developing them independently.

This exact language was relied upon in *Public Citizen Health Research Group v. FDA,* Civ. A. No. 94–0017(RMU) (D.D.C. April 10, 1995) ("*Public Citizen* slip op."), a case filed in this district on the same date as the instant matter. As with this case, Public Citizen filed a FOIA suit seeking all records concerning preclinical and clinical trials concerning a drug—fialuridine ("FIAU")—for which clinical trials were halted because of irreversible liver damage and the eventual death of five patients. *Id.* at 2. In determining that FOIA exemption 4 was properly asserted, Judge Urbina noted the immense amount of time and money that would be saved if other companies could obtain the information contained in the FIAU IND, *even if FIAU itself was not being developed by competitors. Id.* at 12. Upon review of all the information supplied by the defendants and intervenor-defendants, Judge Urbina concluded that the sponsors would "clearly suffer substantial competitive injury if the [safety and effectiveness] information is released because of the nature of the drug approval process." *See id.* at *17. See also Citizens Comm'n on Human Rights v. FDA,* Civ. A. No. 92–5313(JMI), slip op. at 17 (C.D.Cal. May 10, 1993) (determining that based upon an analysis of the drug approval process and the nature of the withheld information, that release of the requested information would be likely to cause substantial competitive injury), *remanded in part on unrelated grounds,* 45 F.3d 1325 (9th Cir. 1995). These cases stand for the proposition that release of the types of data and information contained in NDA and IND files have been previously held to satisfy the "substantial commercial harm" exemption 4 standard.

This court now must now review the declarations and *Vaughn* indices of the sponsors and determine whether they have adequately demonstrated that disclosure of the requested documents contained in these six INDS would likely cause them significant commercial injury.

1. Schering's INDs

Schering has five INDs for which Public Citizen would like safety and effectiveness data disclosed pursuant to its FOIA request. The first three are applications for an antifungal agent—INDs 35757, 34465, and 31911. As to the documents as a group, Schering contends that it is presently building on the results of its IND experience to develop a successor drug currently in clinical testing. *See* Declaration of George H. Miller ("Miller Declaration") ¶¶ 9, 14. Disclosure of the IND would potentially allow one or more of its competitors to follow in Schering's footsteps, and thereby get a competitive product to the market sooner than otherwise. *Id.* ¶ 14, 17–21, 22–24, 25–26, 27. Furthermore, revealing prematurely the particular fungal infection targeted by the IND would reflect Schering's judgment that the fungus was one that was not well-controlled by existing drugs, and, therefore, other companies would know to devote their energies in that direction. *Id.* ¶ 4. As evidence of the confidentiality of the information, the company notes that Schering personnel could only gain access on a need-to-know basis, and the information would only be released to third parties when confidentiality agreements were obtained. *Id.* ¶ 12.

Schering goes on to describe in some detail the specific classes of documents contained in the IND files about which they are concerned and the precise manner in which those documents would be used by competitors if the information was publicly available. The Miller Declaration explains that the preclinical pharmacology data reflects basic research on the mechanisms by which fungal infections occur and may be treated. The data also reflect disease models that are a valuable product of the company's research and development efforts, and the models would be valuable to competitors. *Id.* ¶¶ 17–

21; Schering Memorandum at 13. The toxicology studies have allowed the company to link the chemical structure of the drugs with specific toxicological problems, which has allowed Schering to develop new compounds critical to the development of the successor product. *Id.* ¶ 23. This data would also be applicable to products with identical or similar metabolites. *Id.* ¶ 24. The Miller Declaration goes on to explain the value of the clinical protocols; namely, that they reflect the testing required in order to examine safety and effectiveness. *Id.* ¶ 26. Finally, the Miller Declaration addresses the clinical studies (test results and annual and supplemental reports), noting that they reflect basic research product on the type of compound in the IND and the pharmacology, toxicology and protocols which would direct competitors as to which paths to take based on Schering's reported successes and failures. *See* Miller Declaration ¶¶ 27–28. Schering has also supplied detailed *Vaughn* indices identifying each contested document and the reason for non-disclosure, and these *Vaughn* indices are extensively cross-referenced in the Miller Declaration. Based on the foregoing, this court concludes that release of these INDs would likely cause substantial competitive harm to Schering.

The fourth IND (30647) was an application for a product designed to suppress allergic inflammations and subsequent symptoms of asthma. Schering again alleges with great specificity that disclosure of the documents as a group would be a likely cause of substantial commercial harm because "the toxicology reports would be directly applicable to compounds whose metabolites are similar to those of IND 30647, including other leukotrine inhibitors. Bringing Leukotrine inhibitors to market has not been easy for Schering or other manufacturers—FDA has only approved two, both within the past twelve months." Schering Memorandum at 14; Declaration of Francis Cuss ("Cuss Declaration") ¶ 18. Schering also notes that their toxicity and clinical testing revealed unanticipated effects of the drug, leading them to believe that its anti-inflammatory effects are occurring through a mechanism other than leukotrine inhibition. Multi-million dollar projects related to this finding are in their

early stages, and these projects are "vulnerable" because "neither the regulatory nor patent process has yet commenced with respect to the new compounds under investigation." *Id.* at 15. Schering also points to the fact that they "kept highly confidential the information that is contained in the IND files," noting the same restrictions on access as for the three aforementioned INDs. Cuss Declaration ¶ 12.

As to the specific documents in the IND file, the Cuss Declaration asserts that the pre-clinical toxicology studies and the data contained within would be relevant to any drug product whose metabolites were similar to those in the IND. *See* Cuss Declaration ¶ 18. More importantly, the toxicity and clinical data could be used to direct a competitor to follow in Schering's footsteps on a new drug development project currently underway. *Id .* ¶ 19. For the clinical test results and annual and supplemental reports, Schering states that the test data has substantial competitive significance when considered in the context of the toxicology studies. In summary, Schering notes that "[t]he premature disclosure of the information in the file of IND 30647 would give substantial assistance to Schering's competitors, and would enable them to save substantial sums of money, focus their R & D efforts on areas of particular interest to Schering, and bring their competitive products to marker sooner." Schering Memorandum at 16 (citing Cuss Declaration ¶¶ 11, 18–19, 21).[4] Again, Schering has provided a detailed *Vaughn* index, and the assertions in Cuss Declaration are copiously cross referenced to the documents in the index. Based on the foregoing, this court determines that release of IND 30647 would likely cause substantial competitive harm to Schering.

Finally, IND 18113 was an application for a substance that was one of four isomers making up a prescription drug product that was to be used to control blood pressure in cases of severe hypertension. Schering states that three other isomers remain undeveloped. Again, Schering's allegation of competitive harm meriting the assertion of exemption 4 is based upon their concern that information in the IND files would have "significant applicability" to a pharmaceutical company seeking to develop any one of the three isomers, or a related product. Schering Memorandum at 17. Again, Schering notes the extensive efforts undertaken to keep the materials confidential. Declaration of Ronald J. Garutti ("Garutti Declaration") ¶ 23.

Looking to the specific classes of documents at issue, Schering contends that the pre-clinical pharmacology data would reveal basic research into pharmacological treatment of hypertension and angina and reveal its valuable disease models based on laboratory and animal test data, both which are the product of substantial R & D efforts. *Id.* at ¶¶ 27–29. The preclinical toxicology studies would be applicable to drugs having common metabolites to those of IND 18113, and such products are under active investigation by other companies. *Id.* at ¶¶ 30–31. The clinical protocols, the development of which require an assessment of regulatory requirements and experience with the FDA and reflect the company's judgment as to what will be needed to determine safety and effectiveness, are considered to be a valuable asset because there is no set protocol for clinical testing and because they are expensive and time consuming to create. *Id.* ¶ 32. Finally, the clinical test results and the annual and supplemental reports have commercial significance for the reasons stated above and for the reasons described in the other IND discussions. Again, Schering has provided the court with a detailed *Vaughn* index, and the Garutti Declaration cross-references the index in making its general and specific claims for exemption. Based on the forego-

---

4. It should be mentioned that for IND 30647, Schering has concluded that the clinical test protocols no longer have any commercial significance, and the company does not oppose their release provided that they can be reasonably segregated from other IND information. This court takes notice of Schering's recognition that some of the requested documents may be safely released as evidence that their claims of exemption, supporting affidavits and *Vaughn* indices are grounded in good faith—that the company is not reflexively resisting every request for disclosure. *See also* Miller Declaration ¶ 20 (determining that certain information regarding microbiology is not confidential and not within the scope of exemption 4).

ing, this court determines that release of IND 18133 would likely cause substantial competitive harm to Schering.

## 2. HMR's IND

HMR's predecessor, Hoechst–Rousell Pharmaceuticals, Inc. filed its IND in 1987 in order to begin studies of an antibiotic drug used primarily to treat serious infections in hospitalized patients. As to its allegation of a continuing commercial interest in the drug and the substantial competitive harm that would be suffered through disclosure of the requested information, HMR's Declaration of Elaine S. Waller ("Waller Declaration") states that the antibiotic drug that is the subject of the IND has not yet received FDA approval, and that HMR still intends to pursue approval. Waller Declaration ¶ 27. The company then goes on to explain that the public availability of records prior to approval of the drug would unfairly allow competitors to use HMR's confidential information to compete against HMR in the antibiotic marketplace, possibly getting their products to market before HMR. *Id.* ¶ 16.

Turning to the specific documents at issue in Public Citizen's FOIA request, HMR first notes that the preclinical pharmacology and toxicology information includes data on the mechanisms of action, microbiology, and pharmacokinetics of the drug, as well as data evaluating the pharmacological and toxicological effects on animals. Premature disclosure would give other potential sponsors an unfair ability to submit the valuable data in their own INDs and NDAs prior to approval of HMR's drug (should approval ultimately be granted). Additionally, this research could be used by competitors to gain insight into HMR's current drug development efforts, which, as HMR explains, "would defeat the protections that make costly research and development of the drug products feasible." HMR Memorandum at 17. The IND file at issue also contains numerous documents concerning clinical protocols and clinical development plans that represent a substantial investment of time and energy as well as creativity; if disclosed, competitors could adopt the techniques developed without themselves having invested in the cost of

developing them. Waller Declaration ¶ 32. The file also contains the results of clinical studies that include safety reports disclosing clinical observations of patients and related information; HMR alleges that substantial competitive harm would result from release because the clinical data could be used in competitors' research and development of their own drug products. Finally, the IND file contains annual reports that contain much of the valuable information developed under the IND, the release of which could potentially result in the competitive harms enumerated above. HMR has copiously cross-matched each of its allegations of competitive commercial harm with each document summarized in its *Vaughn* index.

▓ Public Citizen notes, and HMR does not contest, that this IND involves a drug that is presently on the market in other countries. *See* Waller Declaration ¶ 22. Because it is available abroad, plaintiff contends that other pharmaceutical companies already have a great deal of information about it, and the release of the requested safety and information data cannot be a likely cause of substantial competitive harm. As Public Citizen accurately notes, information that has been publicly disseminated cannot be withheld under exemption 4. *See Anderson v. HHS,* 907 F.2d 936, 952 (10th Cir.1990) ("no meritorious claim of confidentiality" can be made for documents in the public domain); *CNA Financial Corp. v. Donovan,* 830 F.2d 1132, 1154 (D.C.Cir.1987) (if the data requested under FOIA is in the public domain, the submitter cannot claim confidentiality).

However, the mere fact that the drug is available abroad does not, without more, prove that the specific information contained in the IND file is in the public domain. HMR notes that the IND file contains a significant amount of information that is not available domestically or in any other foreign market and ordering disclosure of the entire IND file would result in the release of safety and effectiveness data that would not be otherwise available. *See* HMR Opposition–Reply at 6. Other information that may be publicly available as a result of marketing abroad becomes a source of likely competitive commercial harm if released *in the con-*

*text of* FDA's clinical holds, HMR's responses to the clinical holds, and the FDA's overall evaluation. "In my opinion the IND data in this context is particularly valuable because it provides a guideline for any company wishing to further develop and study the drug product in pursuit of FDA approval." Supplemental Waller Declaration ¶ 4. This court agrees that providing the requested information in the context of the FDA holds and FDA evaluation of the continued pursuit of the clinical trials would likely be a source of substantial harm to HMR. Despite the fact that some of the requested safety and effectiveness data may be available because of overseas marketing, the context provided by the FDA clinical holds and other actions presents that information in a framework such that it may properly be considered as different than the same information not presented in that context. Therefore, the fact that the drug product is marketed abroad does not diminish HMR's claim of competitive commercial harm from disclosure of the safety and effectiveness data contained in the IND.

Based on the foregoing, this court determines that release of the INDs would likely cause substantial competitive harm to HMR.

**B. Public Citizen's Claims that the Applications Have Been Abandoned, and Therefore the Safety and Effectiveness Data Must be Disclosed Absent "Extraordinary Circumstances"**

**1. Schering's INDs**

■ All five of Schering's IND applications, by Schering's own admission, have been abandoned and/or withdrawn, meaning that Schering has decided not to pursue approval of the specific drug products that were the subject of the INDs. *See* Hooton Declaration ¶ 43. As explained above, FDA regulations require the release of safety information and effectiveness data, upon request, when no work is being or will be done to have the application approved. 21 C.F.R. § 314.430 reads, in relevant part:

All safety and effectiveness data and information which have been submitted in an application and which have not been previously been disclosed to the public and are available to the public, upon request, at the time any one of the following events occurs unless extraordinary circumstances are shown:

(1) No work is being or will be undertaken to have the application approved.[5]

This disclosure policy was codified by Congress in 1984 through the Waxman–Hatch Amendments to the FD & C Act, *see* 21 U.S.C. § 355(*l*), with minor changes in language not relevant here. The question that this court has been called upon to address—which appears to be one of first impression—is whether the showing that must be made by the FDA and an intervenor-sponsor in order to avoid release of safety and effectiveness data is more stringent in cases in which the IND has been definitively abandoned, or more specifically, when "no work is being taken or will be undertaken to have the application approved." Put another way, does "a showing under FOIA's Exemption 4 of competitive commercial harm to the drug's sponsor from release of such information [safety and effectiveness information] qualif[y] as a showing of extraordinary circumstances"? FDA Opposition–Reply at 4. Significantly, nowhere in the FD & C Act or in the FDA's regulations is the term "extraordinary circumstances" explicitly defined. *See* FDA Opposition–Reply at 6.

Before reaching the question presented, a threshold matter raised by defendants must be addressed. Both the FDA and Schering contend that plaintiff's reliance upon section 314.430(f) without consideration of the entire regulatory context is misplaced, and that the proper regulation to look to in order to resolve this matter is 21 C.F.R. § 20.60 ("Applicability of Exemptions"). The provision states:

The exemptions established in this subpart shall apply to all Food and Drug Adminis-

---

**5.** Although this provision specifically addresses only New Drug Applications ("NDAs"), the regulations make it clear that IND files are to be treated in the same manner. *See* 21 C.F.R. § 312.130(b) (stating that the availability of data and information in an IND will be handled in accordance with provisions established for NDAs in § 314.430). *See also* Plaintiff's Memorandum at 15–16 (explaining the regulation); HMR Memorandum at 9 (same).

tration records, except as provided in subpart E of this part. Accordingly, a record that is ordinarily available for public disclosure in accordance with the provisions in subpart F of this part or of another regulation cross-referenced in § 20.100(c) is not available for disclosure to the extent it falls within an exemption contained in this subpart.

One of the "exemptions contained in this subpart" is 21 C.F.R. § 20.61, which limits disclosure of trade secrets and commercial or financial information which is privileged or confidential—the FDA's adaptation of FOIA exemption 4. Safety and effectiveness data which is to be disclosed upon abandonment of an application is "a record that is ordinarily available for public disclosure [absent extraordinary circumstances]" in accordance with a regulation cross-referenced in section 20.100(c). *See* 21 C.F.R. § 20.100(c)(17). Therefore, section 20.60 dictates that if data or information is not subject to disclosure because it is exempt under one of the FOIA exceptions—in this case, exemption 4—that disclosure cannot be compelled pursuant to other FDA regulations which might otherwise mandate disclosure of the materials, even if a more severe burden must be overcome in order to avoid production. In other words, the regulatory scheme contemplates that in a battle between FOIA and another cross-referenced FDA disclosure requirement, FOIA wins.

And, were this court only dealing with FDA's regulatory scheme, this inquiry as to the proper interpretation of "extraordinary circumstances" would be unnecessary and defendants and intervenor-defendants' legally sufficient demonstration of a likelihood of substantial competitive injury would be sufficient for this court to grant summary judgment. However, 21 C.F.R. § 314.430 was expressly codified by Congress through the Waxman–Hatch Amendments to the FD & C Act in 1984. *See* 21 U.S.C. § 355(*l*). Therefore, its obligations operate independently of the regulatory framework created by FDA; as plaintiffs note, "the general regulation of § 20.60 cannot nullify Congress's command that abandoned drug applications be released." Plaintiff's Reply at 6. Therefore, this court is compelled to analyze the mean-

ing of the term "extraordinary circumstances" and determine whether it is, in fact, coextensive with competitive commercial harm; and, if it is not, reach a conclusion as to whether the higher threshold has been met by the sponsors through their declarations and *Vaughn* indices.

The tools for this analysis come from a familiar source: *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which directs a reviewing court to defer to an agency's permissible construction of a statute the agency is charged to administer if Congress has not directly spoken to the question at issue. While it is true that a court should not defer to an agency's construction of FOIA's meaning, *see FLRA v. Department of the Treasury,* 884 F.2d 1446, 1451 (D.C.Cir.1989), it is not an interpretation of FOIA that is at issue here, but rather a particular section of the FDA's governing statute—21 U.S.C. § 355(*l*). *See Tax Analysts v. IRS,* 117 F.3d 607, 613 (D.C.Cir. 1997).

 Whether this matter presents a proper situation in which to engage in a *Chevron* analysis is not uncomplicated. When a court defers to an agency interpretation under *Chevron,* the interpretation is presumed to be an agency decision that has a binding effect—most typically a rulemaking or an adjudication. "Of course, *Chevron* deference assumes that the agency has adopted an interpretation of the statute and this court knows what that interpretation is." *Id.; see also* Kenneth C. Davis & Richard J. Pierce, *Administrative Law Treatise* § 3.5 (3d ed. 1994) ("When an agency policy is affirmed under *Chevron* step two, a court has permitted the agency to announce a policy that is binding on the court and on all citizens.") Here, the agency has neither engaged in a rulemaking nor otherwise "formally" announced a position as to the meaning of extraordinary circumstances. Rather, all this court is presented with is the letter denial of Public Citizen's FOIA request and the briefs of the FDA. This court is mindful of the fact that litigating positions may be unreliable evidence of an agency's policy.

*See* Davis & Pierce § 3.5. However, in *Tax Analysts* this circuit addressed a very similar situation; specifically, where interpretation of a term ("data") in the IRS's governing statute was determinative as to whether the withholding of information pursuant FOIA Exemption 3, 5 U.S.C. § 552(b)(3), was proper. Judge Randolph, writing for a unanimous panel, noted, "[o]ne might consider the interpretation of § 6103 reflected in the IRS's argument to be merely a litigating position. But that would not necessarily preclude our deferring to the agency's interpretation so long as it represented the IRS's 'fair and considered judgement on the matter,'" *Tax Analysts,* 117 F.3d at 613 (quoting *Auer v. Robbins,* 519 U.S. 452, ——, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997) (permissible to defer to agency interpretation when presented in a legal brief)). *See also National Wildlife Federation v. Browner,* 127 F.3d 1126, 1129 (D.C.Cir.1997); *Skandalis v. Rowe,* 14 F.3d 173, 179 (2d Cir.1994) (giving deference to an agency interpretation expressed in an amicus brief, when that position was consistent with the position the agency had held over time). Given that this court is presented with what it considers to be the FDA's "fair and considered judgment on the matter," and that the position is consistent with positions that the agency has taken in the past, this court will proceed with the *Chevron* analysis.

The first inquiry under *Chevron* is whether Congress has "directly spoken to the precise question at issue," because if Congressional intent is clear, the analysis comes to an end. *Chevron,* 467 U.S. at 842. To make this determination, the court is directed to use the traditional canons of statutory interpretation, including the plain meaning of the terms to be interpreted, the purpose of the statute, and the legislative history. *See, e.g., Environmental Defense Fund v. EPA,* 852 F.2d 1316, 1327 (D.C.Cir.1988) (holding that to ascertain congressional intent, a court should look first to language and structure, then to secondary indicia such as legislative history).

First, this court looks to the plain meaning of the term "extraordinary." *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). According to Black's Law Dictionary (5th ed.), extraordinary is defined as, "[o]ut of the ordinary; exceeding the usual, average, or normal measure or degree; beyond or out of the common order or rule; not usual, regular, or of a customary kind; remarkable; uncommon; rare." So, the first question that this court must answer is whether "a likelihood of substantial commercial harm," as those terms have come to be understood for FOIA purposes, is encompassed under that definition.

Based upon (1) the fiercely competitive nature of the pharmaceutical industry, (2) the sums of money at issue and the economic value of the data, (3) the frequency with which research data from abandoned projects could potentially be utilized by competitors, and (4) the frequency with which drug companies raise the exemption 4 defense, the potential for competitive commercial harm that may result from the disclosure of safety and effectiveness data through a FOIA request does not appear to be "out of the ordinary" or "exceeding the usual." IND data will often be applicable to the development of a competitor's products, and it does not appear "extraordinary" to this court that a company would not want IND data released when they plan to use that data in successor projects. In fact, while not diminishing the detailed and specific showing made by Schering as to substantial harm in this case, the Garutti Declaration states that the disclosure of the confidential and proprietary information in an IND file would "*as a general matter*" cause commercial detriment to the sponsor. Garutti Declaration ¶ 17. It is true that disclosure will not always be a source of substantial commercial harm; that point can be aptly demonstrated by the fact that three companies with responsive INDs in this matter did not even attempt to prevent disclosure to Public Citizen, and a fourth company settled and subsequently disclosed. However, the fact that a company will sometimes acquiesce to requests to disclose and at other times wish to prevent disclosure does not indicate that the latter case is "extraordinary ."

Therefore, while not dispositive of this court's analysis, the ordinary meaning of the term at issue indicates that the circum-

stances under which disclosure was to be prevented were not supposed to arise with great frequency—they were to be "uncommon" or "rare." As it does appear to this court that the potential for competitive commercial harm through public disclosure of safety and effectiveness data and information is not out of the ordinary, competitive commercial harm and extraordinary circumstances do not seem to be coextensive.

Second, this court looks to the structure and purpose of the statute. The FDA appears to characterizes section 355(*l*) as a the provision as having an anti-disclosure presumption, as it states, "safety and effectiveness data contained in such applications will not be disclosed to the public except under certain limited circumstances in which such data are presumed to have lost their competitive value to the drug sponsor." FDA Opposition–Reply at 5. However, this court interprets the statutory mandate as having an expressly pro-disclosure preference, as it reads, "[s]afety and effectiveness data and information ... *shall be made available* to the public, upon request, *unless* extraordinary circumstances are shown." (emphasis added). The "A unless B" structure of the statute cannot be reinterpreted to mean "not A unless B." It is readily apparent that disclosure is to be the norm when any of the five triggering events occur, *see* 21 U.S.C. § 355(*l*)(1–5), *with the exception* of when extraordinary circumstances are properly pleaded. *See also* 57 Fed.Reg. 17950, 17971 (1992) ("Thus the statute clearly favors disclosure of safety and effectiveness data except in limited situations.") Therefore, to the extent that the structure and purpose of the statute sheds any light on the proper interpretation of "extraordinary circumstances" it indicates that disclosure is to be the norm, and non-disclosure the exception.

It is this court's consideration of the legislative history that eliminates any doubt that the term "extraordinary circumstances" was not meant to be co-extensive with "a likelihood of substantial competitive harm." At the outset, it should be noted that there are individual statements offered by each of the bill's sponsors during the floor debates that, were the other sponsor's language not also

present, would appear to be "silver bullets" in favor of the litigants' differing constructions. The FDA cites Senator Orrin Hatch, who stated:

> Under current practice, which will be the practice under the bill, *extraordinary circumstances are present for example when the information is trade secret or confidential commercial information* .... As another example, safety and efficacy data contained in an application that was not approved will not be released if the data retains possible commercial, competitive value. *In short, the provision retains the applicability of the (b)(4) exemption under the Freedom of Information Act."*

130 Cong. Rec. S10981, S10988 (Sept. 12, 1984) (emphasis added). Public Citizen counters with the statement of Representative Henry A. Waxman, who argued:

> Section 104 [the extraordinary circumstances provision] was not intended to be a blanket reference to the FOIA. ... since FDA would have the authority to withhold data under exemption 4 of the FOIA in the absence of Section 104 *the term "extraordinary" cannot and should not be read as meaning exemption 4 of the FOIA.* Therefore, a company could not prevent disclosure of a simple claim or demonstration that the data were confidential, commercial information or that the data have possible commercial competitive value.

130 Cong. Rec. E4423 (October 10, 1984) (emphasis added). Given that the bill's co-sponsors have expressed diametrically opposed views on the exact question before the court, it is fair to say that their statements, without more, must be deemed inconclusive for *Chevron* purposes.

It is the "history" of the text of the bill itself, above and apart from any statements made by individual legislators, that presents the most compelling rationale for concluding that competitive commercial harm cannot be coextensive with extraordinary circumstances, and that the latter presents a drug sponsor with a more severe burden to overcome in order to prevent release. Representative Waxman noted that when the bill initially came before the Senate, the introduced version expressly provided that " 'extraordi-

70

nary circumstances' exist when safety and effectiveness data are found to be 'trade secret or confidential commercial or financial information.'" Cong. Rec. E4423, at 225. However, this language was subsequently *deleted* and did not appear in the version that was ultimately signed into law. The deletion of the exact language that would have resolved this question squarely in defendants' favor cannot be ignored by this court as an event without consequence. In determining whether extraordinary circumstances does include a likelihood of substantial competitive harm this court must be "mindful that Congress had before it, but failed to pass, just such a scheme." *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank*, 510 U.S. 86, 100, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993).

Representative Waxman then went on to note that while the FDA general counsel had interpreted the term "extraordinary circumstances" to include confidential commercial information, his reading of section 104 [the provision in question] was intended to "codify the agency's current practice as we understood it and as I described it in the above paragraph, not as the FDA described it in its letter," again indicating that the FDA's previous approach was not to be followed under the statute. 130 Cong. Rec. E4423. Had the original language defining extraordinary circumstances that Congressman Waxman objected to not been struck, this court would not necessarily be compelled to attach any more weight to his stance on the law than that of Senator Hatch. However, because Representative Waxman, in his own words, "negotiated to have the deleted language struck," and that the language was in fact struck, his interpretation must be accorded due weight by this court. *Id.* Therefore, Representative Waxman's statements that "Section 104 was not intended to be a blanket reference to the FOIA"; "Section 104 creates a strong presumption that the data covered by the section will be available to the public"

and "the term 'extraordinary' cannot and should not be read as meaning Exemption 4 of the FOIA" must be taken as strongly indicative as to how this provision should be interpreted by the agency and the courts. *Id.*

■ Based upon the foregoing, this court finds that Congress has directly spoken to the precise question at issue. The FOIA exemption 4 standard of "a likelihood of substantial competitive harm," in order to preclude disclosure, without more, is not an extraordinary circumstance, as that term is understood under 21 U.S.C. § 355(*l*). It is unambiguous that the statute anticipates more liberal disclosure of safety and effectiveness data when a trial has been abandoned. Consequently, there is no need to proceed to step two of the *Chevron* analysis and determine whether the agency has articulated a permissible construction of the statute. *See Chevron*, 467 U.S. at 842.

The remaining inquiry, therefore, is whether Schering, through its sworn declarations and *Vaughn* indices, has met the threshold of "extraordinary circumstances" with regard to the information contained in the IND files such that disclosure is still not warranted. This court concludes that it has not. As explained in Part II.A.1, Schering has adequately demonstrated how disclosure of the requested records would likely cause it substantial commercial injury, which is the FOIA Exemption 4 standard. What it has not demonstrated, and what it needed to demonstrate in order to satisfy 21 U.S.C. § 355(*l*), is why the situation it faces is somehow extraordinary, uncommon or otherwise atypical of the situation faced by many (if not the majority of) sponsors of INDs when no work is being or will be done to have that sponsor's application approved.[6] Having failed to demonstrate extraordinary circumstances, summary judgment must be granted to plaintiff.

6. During the floor debates, Representative Waxman offered at least one example of what could potentially constitute "extraordinary circumstances": when the data qualifies as a "trade secret," as that term is defined in *Public Citizen*, 704 F.2d at 1288. 130 Cong. Rec. E4423. It also could be the case that Schering's situation is somehow substantially different from the pharmaceutical companies who did not oppose the release of their IND files prior to this litigation, and that difference, whatever it may be, could have constituted an "extraordinary circumstance."

This court recognizes that through this holding, it has created a situation in which sponsors of INDs will often endeavor not to terminate their applications solely out of fear that such terminations will trigger the mandatory disclosure of safety and effectiveness data. Nor does this court doubt that many pharmaceutical companies will engage in protracted litigation with the FDA in order to forestall such terminations. And, such a result directly contravenes a statement by the FDA in its preamble to the safety and effectiveness final regulations when they were first promulgated, which stated: "[t]he Commissioner advises that the termination of an IND is not dispositive with respect to the availability of information contained therein." 39 Fed.Reg. 44602, 44633 (1974). · However, this result cannot be totally unanticipated by FDA or the sponsors, as the regulations for placing a drug application on inactive status (discussed in more detail, Part II.B.2) were developed in part because of concerns regarding disclosure absent extraordinary circumstances. *See* 48 Fed.Reg. 26720,· 26731 (1983). And this concern predates the Waxman–Hatch amendments to the FD & C Act. Despite the fact that sponsors will now simply elect to not withdraw their applications solely to avoid disclosure, this court nonetheless reads 21 U.S.C. § 355(*l*) as a clear statement that at the time that no work is or will be done on an IND application, safety and effectiveness data is to be released, barring extraordinary circumstances. The fact that there may now be battles over whether "no work is or will be done" by a sponsor should not be surprising, because Congress has unambiguously made that occurrence "dispositive with respect to the availability of information contained therein."

### 2. HMR's IND

As with the Schering INDs, Public Citizen again points to the sponsor's extended period of inactivity on the IND as proof that either: a) there is no longer a continuing commercial interest in the results, and/or b) the higher threshold of "extraordinary circumstances" must be met in order· to defeat disclosure. Having already determined that HMR has adequately demonstrated that release of the IND file would result in a likelihood of sub- stantial commercial harm, this court proceeds directly to the latter claim.

■ Unlike Schering, HMR does not concede that it has abandoned its IND. The Waller Declaration states "HMR is at the current time actively considering whether and how to undertake reactivation of the IND and resumption of clinical studies" and that "HMR believes that the drug could fulfill a significant medical need and accordingly has by no means abandoned the possibility of obtaining approval for the drug in the United States." Waller Declaration ¶ 22. Notably, the FDA has not controverted this claim by HMR. Quite the opposite, it looks to that same declaration in reaching its conclusion that, as far as the agency is concerned, HMR has not abandoned the drug product that is the subject of the IND, and that it is not the case that "no work is being taken or will be undertaken to have the application approved." *See* FDA Opposition–Reply at 11– 12; *compare Public Citizen,* slip op. at 11 (noting that when a sponsor states that an IND has not been abandoned, the FDA does not consider that IND to be abandoned).

Public Citizen counters by arguing that a mere declaration in an affidavit that an IND has not been abandoned is insufficient to prove that no work is being or will be ˙done on the application. Otherwise, "[a] company's highly generalized and entirely self-serving statements about potential exploitation of a drug would suffice to sustain claims of substantial competitive harm . . . ." Plaintiff's Reply at 10–11. Public Citizen would require some demonstrable concrete action on the part· of a sponsor in order to prove that its IND has not been constructively abandoned through inactivity. *See* Plaintiff's Reply at 10–12 (also noting that under the regulations it may take as long as seven years after clinical studies have stopped before the public may gain access to the relevant data). ˌ

This court finds no support for plaintiff's contention that there must be objective evidence in˙ the form of concrete action(s) taken by a sponsor to demonstrate that an˙ IND application has not been permanently and irrevocably abandoned. The most compel-

ling factor in reaching this conclusion is the FDA regulations addressing inactive status. They recognize that for a variety of reasons there often may be a substantial period of inactivity by a sponsor on a given application, and therefore considers merely inactive INDs to be "in effect" for the purposes of FDA regulations on public disclosure of data and information. *See* 21 C.F.R. § 312.45(c). More significantly, the regulations do not provide for agency termination of an IND until that IND has been inactive for five or more years. *See* 21 C.F.R. § 312.45(e). This court sees no reason to take issue with the agency's definition of when an application should be considered to be terminated for the purposes of safety and effectiveness disclosure when that definition reflects the agency's expertise and time-tested understanding of the manner in which the drug development process often progresses.

■ Also, this court is in agreement with FDA's contention that to require a sponsor to engage in some form of concrete activity in order to demonstrate non-abandonment, when that activity would have no other purpose than to prove the sponsor's continuing commercial interest, would involve the needless expenditure of funds, time and energy. *See* FDA Opposition–Reply at 11. Consequently, as with all other burdens that must be met in order to justify nondisclosure under FOIA, a sponsor may demonstrate its continuing interest and non-abandonment of a drug application through sworn declarations, when those declarations are clear, specific, describe in detail the continuing interest, and if there is no contradictory evidence of bad faith on the part of the agency. *See Hayden*, 608 F.2d at 1387.

This court finds that HMR has adequately demonstrated through its declarations that it has not abandoned the IND at issue. Plaintiff has presented no evidence—other than the mere passage of time—to dispute HMR's contention that it may again undertake reactivation of the IND, a contention that is supported by Vice President of HMR Elaine Waller's declaration, under penalty of perjury, that "extensive internal HMR meetings

have been held to discuss pursuit of approval in the United States." *See Alyeska Pipeline*, 856 F.2d at 314 ("a motion for summary judgment adequately underpinned is not defeated simply by a bare opinion or an unaided claim that a factual controversy persists"). Also, the FDA has lifted the clinical hold that was previously placed on this IND to permit certain clinical studies. HMR Opposition– Reply at 4. Because this court finds that, for HMR's IND, it is *not* the case that "no work is being or will be undertaken to have the application approved," 21 U.S.C. § 355(*l*) is not triggered. Therefore, all HMR is required to demonstrate to prevail on summary judgment is a likelihood of competitive commercial harm. Having met this burden to this court's satisfaction, *see* Part II.A.2, summary judgment will be awarded in favor of HMR.

## III. PLAINTIFF'S REQUEST FOR DISCOVERY

■ Plaintiff has requested that should this court not grant its motion for summary judgment in whole or in part that it be granted limited discovery. Public Citizen claims that it needs discovery to demonstrate that the claims of competitive commercial harm through disclosure of the safety and effectiveness data are baseless. *See* Supplemental Declaration of Sidney M. Wolfe ¶¶ 16, 18–21. For example, plaintiff seeks access to the name of HMR's IND, which would allow them to prove the degree to which safety and effectiveness data is already publicly available. Also, Public Citizen wishes to conduct further investigation into the question as to whether HMR has permanently abandoned its drug trials despite their sworn declarations to the contrary.[7]

■ Discovery is to be sparingly granted in FOIA actions. Typically, it is limited to investigating the scope of the agency search for responsive documents, the agency's indexing procedures, and the like. *See, e.g., SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200–02 (D.C.Cir.1991). If a court is satisfied that the affidavits supplied by the

---

7. Having granted summary judgment for Public Citizen for the Schering INDs, there is no need

to discuss the rationale for discovery as it pertains to Schering.

agency meet the established standards for summary judgment in a FOIA case and that plaintiff has not adequately called these submissions into question, no factual dispute remains, and discovery is inappropriate. *See Goland,* 607 F.2d at 352 (when affidavit requirements are met, judge has discretion to forgo discovery and award summary judgment on the affidavits). Most significantly, this circuit has noted that discovery is not to be granted when the discovery is sought for the "bare hope of falling upon something that might impugn the affidavits" submitted by the agency. *Founding Church of Scientology v. NSA,* 610 F.2d 824, 836–37 n. 101 (D.C.Cir.1979) (citing *Goland,* 607 F.2d at 355).

Discovery is not appropriate in this matter. The court is satisfied that the affidavits and declarations of the agency and the HMR are adequately detailed and submitted in good faith, and that no factual dispute remains. Plaintiff has provided no evidence that would call the agency's or HMR's detailed and non-conclusory submissions—which have the presumption of good faith—into question. *See, e.g., Ground Saucer Watch v. CIA,* 692 F.2d 770, 772–73 (D.C.Cir.1981). As explained in Part II.B.2, HMR has provided this court with sufficient information detailing its continued pursuit of FDA approval of its IND. Some of the other information that HRG seeks in discovery, such as the name of HMR's investigational drug subject to the IND, is for all intents and purposes an attempt to obtain precisely that which is at issue in the FOIA suit itself, which is clearly improper. *See, e.g., Local 3, I.B.E.W., AFL–CIO v. NLRB,* 845 F.2d 1177, 1179 (2d Cir. 1988) (discovery not awarded when the discovery sought is of documents claimed to be exempt). Plaintiff having failed to provide a proper basis for discovery, and this court finding none, the request for discovery will be denied.

A separate order shall issue this day.

### ORDER

This matter comes before the court on the parties' cross motions for summary judgment. For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that Defendant Food and Drug Administration's Motion for Summary Judgment is DENIED IN PART and GRANTED IN PART;

ORDERED that Defendant–Intervenor Schering Corporation's Motion for Summary Judgment is DENIED;

ORDERED that Defendant–Intervenor Hoechst Marion Roussel, Inc.'s Motion for Summary Judgment is GRANTED;

ORDERED that Plaintiff Public Citizen Health Research Group's Cross–Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART;

ORDERED that defendant shall release to plaintiff the records at issue in this case relevant to defendant-intervenor Schering Corporation. All other records are properly withheld.

Judgment shall be entered accordingly.

SO ORDERED.